Leonard PICCIURRO, true name Dominic
Frank Picciurro, Appellant,

v.

UNITED STATES of America,
Appellee (two cases).

Nos. 15794, 15795.

United States Court of Appeals
Eighth Circuit.

Jan. 8, 1958.

Rehearing Denied Feb. 10, 1958.

Kenneth J. Ehlenbach and Charles M. Hanratty, Milwaukee, Wis., for appellant.

George E. MacKinnon, U. S. Atty., St. Paul, Minn. (Hyam Segell, Asst. U. S. Atty., St. Paul, Minn., on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and VOGEL, Circuit Judges.

GARDNER, Chief Judge.

Leonard Picciurro, Shirley Frances Picciurro and Charles Lipscomb were charged in two indictments, the first of which charged them with conspiring together and with each other to persuade, induce, entice and coerce a woman to travel in interstate commerce from Minneapolis, Minnesota, to Menomonee Falls, Wisconsin, for the purpose of prostitution, debauchery and other immoral practices in violation of Title 18 United States Code, Section 371. Eight overt acts were charged. The second indictment contained two counts. The first count charged them with unlawfully persuading, inducing, enticing and coercing a woman to travel in interstate commerce by railroad train from Minneapolis, Minnesota, to Milwaukee, Wisconsin, for the purpose of prostitution, debauchery and other immoral practices in violation of Title 18 United States Code, Sections 2422 and 2 and the second count charged them with persuading, inducing, enticing and coercing a woman to travel in interstate commerce by airplane from Minneapolis, Minnesota, to Milwaukee, Wisconsin, for purposes of prostitution, debauchery and other immoral practices, also in violation of Title 18 United States Code, Sections 2422 and 2. The actions were consolidated for purposes of trial.

Shirley Picciurro and Charles Lipscomb who were charged jointly with appellant pleaded guilty and thereafter the action proceeded to trial against appellant alone. We shall refer to appellant as defendant.

At the times of the alleged commission of the various counts of the indictments Shirley Picciurro was the wife of defendant but on October 18, 1956, she was divorced so that at the time of filing of the indictments and at the time of the trial the relationship of husband and wife no longer existed between Shirley Picciurro and defendant.

There was evidence introduced by the government tending to prove that defendant and one Rosario Gagliano, who was known as Joe Gag, purchased Club 166 at Menomonee Falls, Wisconsin, which is a suburb of Milwaukee, in the year 1954, and thereafter the business was operated and owned by the defendant and Joe Gag. The club was a white frame building, rather large, with a bar and dining room downstairs and separate rooms upstairs, including a bath and kitchen. In May of 1956 it was decided by the defendant and his partner to have prostitutes working at the club. Shirley Picciurro testified that the first conversation between herself and defendant concerning the hiring of prostitutes took place in May, 1956, in the presence of Joe Gag and that at that time it was agreed that they would have prostitutes working there. Subsequently there were conversations between herself and defendant in the presence of Joe Gag to the effect that if while Shirley was absent from the club she ran into a prostitute that would be suitable for the club she should contact the defendant and discuss whether they should hire her. On or about July 10, 1956, Shirley came to St. Paul, Minnesota. Prior to her leaving Menomonee Falls she again discussed the prospect of hiring a prostitute for Club 166 with defendant and Joe Gag in the event that she ran across anyone who was interested in such a job. It was decided that if she did find someone that she should call defendant. Shirley was in St. Paul approximately a week and a half before she met one Gretta Cotier. At the time of her first meeting Gretta was with one Ronnie Campbell, a known prostitute, and Charles Lipscomb who was acting as her panderer. Lipscomb inquired of Shirley whether Club 166 was a place of prostitution and when told

that it was asked if Gretta could get a job there. In accordance with defendant's instructions Shirley called defendant two or three days after her conversation with Lipscomb. After so telephoning defendant Shirley told Gretta that it was all right for her to go to Menomonee Falls and they made arrangements to go by train on approximately July 24, 1956. Shirley was supposed to purchase the ticket for Gretta's transportation but forgot the money at her mother's house and as a result they missed the train that they planned to take. Shirley subsequently tried to call defendant to advise him of this fact but she was unable to reach him and finally called the daughter of the bartender at Club 166 and told her to tell defendant that he should meet a later train. Shirley and Gretta subsequently left the St. Paul Depot via the Milwaukee Road to Milwaukee and arrived at approximately two o'clock the following morning. The defendant met the train and was introduced to Gretta Cotier and the party subsequently went in the defendant's car to his home in Milwaukee. There was testimony by Gretta, corroborated by testimony of other witnesses, as to the financial arrangements that were made whereby she would split her earnings as a prostitute with defendant and his partner Joe Gag. The defendant used Gretta to attract customers into his house of prostitution and tavern and to curry favor with local authorities so he could remain open. To this end he advised Gretta that she should have sexual relations with the Sheriff of Waukesha County in order that the club could continue in business on its then present basis. Gretta permitted herself to be photographed in the nude by the defendant and on order of defendant performed a strip-tease dance on top of the bar one Sunday afternoon. There was evidence that one Rita Brooks and one Kathleen King, admitted prostitutes, worked at Club 166. At the end of approximately three weeks Gretta Cotier returned to Minneapolis. Relations between her and the defendant were very friendly and the defendant called a cab for her and made a reservation for her airplane ticket.

The defendant told her that it would be nice if she would come back again and she left her clothes there with the thought of coming back.

The method of operation of the club is well delineated in the testimony of Gretta Cotier, Kathleen King and Rita Brooks, all of whom testified that the arrangement was that they were to take their customers upstairs, that they were to get at least ten dollars per customer and that they were to split their earnings with defendant and Joe Gag. All of these girls were known to be prostitutes by the defendant.

Gretta Cotier returned to Club 166 from Minneapolis by airplane in late August, 1956, and continued to ply her trade as before. The method of apportioning the earnings of the prostitutes was explained by the witness Gretta Cotier. The money was put in a drawer and subsequently split two ways, half going to the prostitute and the other half to Joe Gag and defendant.

In view of the verdicts of the jury we have omitted much of the sordid details of the evidence produced by the government and have assumed that all conflicts in the evidence were resolved by the jury in favor of the government.

The defendant took the stand in his own behalf and admitted that he and Shirley had operated Club 166 at Menomonee Falls, Wisconsin. He admitted that Gretta Cotier came to the club on or about July 25, 1956, that she stayed for three weeks and then returned to Minneapolis. He admitted that she subsequently returned for another three weeks, that she stayed at Club 166, that she again returned to Minneapolis and that she had not been back since. He admitted that Gretta was not hired to work as a waitress or barmaid at the club but that she did live upstairs at the club, had her meals or some of them at the club and spent most of her time during the time that she was in Menomonee Falls at the club. He contended that because he was not getting along with his wife Shirley during the summer of 1956 he took over the active management of the business,

and set the policy and that whatever went on at the club as far as he knew was the result of the policy he had set in the operation of the business. He denied that he had ever had any conversation with Gretta about prostituting. He denied that he had ever discussed prostitution with her. He denied that he had ever received any money of any kind from Gretta. He denied that he even knew that Gretta was coming to Menomonee Falls with his wife Shirley on July 25 or 26, 1956. He denied that he had ever observed Gretta taking men upstairs in Club 166. He denied that he had ever called a cab for her when she left Club 166 the first time. He denied that he had a conversation with her about coming back. He denied that he ever talked with Gretta about how much she should charge customers or what division there was to be of the money. He denied that he had ever received any money from Gretta that she supposedly earned as a prostitute. He denied that he had ever made any arrangements between the Sheriff of Waukesha County and Gretta. He admitted that he had hired Kathleen King and Rita Brooks but denied that Rita Brooks had ever worked as a prostitute at Club 166 and denied that she had ever split her earnings as a prostitute with himself and Joe Gag. He denied that Kathleen King had ever engaged in prostitution at Club 166 and denied that she had ever turned over one-half of her earnings to himself and Shirley. He denied that he ever saw Rita or Kathleen go upstairs with any patrons of Club 166. He denied that Gretta had performed a strip-tease dance at Club 166. He denied that he had ever received any money from anybody with a statement that it was "trick" money and he denied that Club 166 was operating as a house of prostitution during the months of July and August, 1956. He admitted that he had been convicted of a felony. He claimed that he did not at any time want Gretta there, either during the first period of time in July and early August or the second period of time in the latter part of August and early September, but

admitted that he never made any effort to get her to leave, nor did he ask her to leave, nor did he ask her to take her clothes when she left the first time. He denied any conversations with Shirley and Joe Gag about the operation of the club in May of 1956. He denied any discussion of prostitution at Club 166 with Joe Gag or in his presence. In the material portions of this testimony he was corroborated by his cousin, Joe Gag, who also admitted he had been convicted of a felony.

At the close of the government's evidence defendant moved for judgment of acquittal which motion was denied. The motion was not renewed at the close of all the testimony and the consolidated case was submitted to the jury on instructions to which the defendant saved certain exceptions. The jury in due course returned verdicts of guilty on all counts of the two indictments and pursuant to these verdicts the court entered judgments sentencing defendant to imprisonment for five years as a single general sentence on both indictments.

In seeking reversal defendant in substance contends that (1) the court erred in admitting into evidence testimony as to conversations between defendant and Shirley Picciurro concerning the hiring of prostitutes, because at the time of the alleged conversations the defendant and Shirley Picciurro were husband and wife and the conversations constituted privileged communications, (2) there was not sufficient evidence to sustain the verdicts of guilty as to each of the three counts of the indictments, (3) the court committed error in the summation of the government's case in its instructions to the jury and thereby invaded the province of the jury, and (4) the court erred in denying defendant a continuance of the trial date and thereby deprived defendant of his constitutional right to a fair trial.

Shirley Picciurro, having pleaded guilty to the charges contained in the indictments, was called as a witness by the government. Before she was permitted to testify counsel for defendant inter-

posed a general objection as to any testimony concerning any conversations between defendant and herself, while she was living as the wife of defendant, as being privileged. In response to this objection the court said:

"She would be allowed to testify to any conversations she had with her husband when there were third parties present because that wouldn't be a privileged communication. She is not now the wife of the defendant, and consequently she is in a position to testify against him, but conversations between them when a third party was not present would be considered a privileged communication even though they are divorced."

Following this ruling counsel for defendant asked that his objection run to all of her testimony without repeating the objection. In response to this request the court said:

"Yes. I think you have indicated your position, so that it may be understood you are taking the position that she is not competent as a witness to testify against him with respect to any fact or circumstance or conversation."

The witness testified that she had had a conversation with the defendant, then her husband, with reference to the hiring of a prostitute in connection with their business. This conversation she testified took place in the presence and hearing of Joe Gag and just prior to the time she departed for Minneapolis. The purport of the conversation was that in her travels she would endeavor to hire a prostitute for Club 166, but only after she conferred with defendant. There were apparently other similar discussions between the witness and the owners of the club, and while defendant contends that the evidence was insufficient to prove that Joe Gag was present at these conversations, we think, viewing it in a light most favorable to the government, there was substantial evidence to show that a third party, to-wit, Joe Gag, was present at these conversations. In these circumstances we think the testimony was admissible. Pereira v. United States, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435; Wolfle v. United States, 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617; United States v. Mitchell, 2 Cir., 137 F.2d 1006; Yoder v. United States, 10 Cir., 80 F.2d 665. In Pereira v. United States, supra, it is said [347 U.S. 1, 74 S.Ct. 361]:

"Although marital communications are presumed to be confidential, that presumption may be overcome by proof of facts showing that they were not intended to be private. Blau v. United States, 340 U.S. 332, 71 S.Ct. 301, 95 L.Ed. 306; Wolfle v. United States, 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617. The presence of a third party negatives the presumption of privacy. Wigmore, Evidence, § 2336."

There was, we think, an additional ground for admitting this testimony. The conversations were not such as from their nature were intended to be confidential. As said in United States v. Mitchell, supra [137 F.2d 1009]:

"For application of the privilege, the communications must be such as from their nature were fairly intended to be confidential."

█ It is, however, argued that the proof of the presence of a third party must be made by testimony other than that of the spouse. The witness could, we think, testify to any fact that made her testimony competent and manifestly testimony may be given by either spouse as to the known presence, hearing or knowledge of the third person. Linnell v. Linnell, 249 Mass. 51, 143 N.E. 813. There was no error in overruling the objection to this testimony.

█ It is next argued that the evidence was insufficient to sustain the verdicts of guilty. As has been observed defendant at the close of all the testimony did not renew his motion for judgment of acquittal. In order to entitle defendant to question the sufficiency of the evidence he must first have presented the question to the trial court by motion

for judgment of acquittal interposed at the close of all the testimony, thus raising a question of law which this court will consider on appeal, and it is well settled that absent such motion this court will not review the evidence. Seventh Amendment, U. S. Constitution; McDonough v. United States, 8 Cir., 248 F.2d 725; Kreinbring v. United States, 8 Cir., 216 F.2d 671; Mitchell v. United States, 8 Cir., 208 F.2d 854; Leeby v. United States, 8 Cir., 192 F.2d 331; Meier & Pohlmann Furniture Co. v. Troeger, 8 Cir., 195 F.2d 193. We shall therefore make no further reference to the sufficiency of the evidence.

■ It is next contended that the court erred in that part of its instructions to the jury in which it summarized the government's case. The exception interposed by defendant to this instruction was as follows:

"Exception is also taken to the Court's instructions with respect to its statement of the government's contentions. We contend that the Court, in outlining to the jury the various contentions of the parties, has overemphasized the respective positions of the government. This was done not only early in the charge, but was made in connection with the discussion concerning the conspiracy, and it was made again in connection with the substantive counts."

We have carefully examined the instructions as a whole and note that in the so-called summation of the government's case the court at all times simply stated what the contentions of the government were. There was no intimation as to what the facts were and the court at all times left to the jury the question of the facts which might or might not sustain the government's contentions. The court could have reviewed the evidence and even expressed its views as to the facts so long as it was made clear that the determination of the facts was the province of the jury and not that of the court. Weare v. United States, 8 Cir., 1 F.2d 617. The instructions were

not argumentative nor did the court become an advocate either for the government or for the defendant. As said by this court in Bram v. United States, 8 Cir., 226 F.2d 858, 864:

"The court made no attempt to declare what the true facts in the case were and there was no summarizing of evidence to the prejudice of defendant."

In the instant case, as has been pointed out, the summarization expressed no opinion as to what the evidence proved but only stated the contentions of the government. Following the summarization which defendant now argues was unfair, the court instructed the jury as follows:

"Well, I have tried to summarize as fairly as I could the Government's position on one hand and the defendant's position on the other. Now, of course, you will bear in mind that when the Court takes upon himself to repeat or summarize the positions taken by the parties in this lawsuit, that the Court merely gives you his best recollection and his understanding and his deductions and inferences from the testimony as to the positions that the parties have taken, and if your recollections or your understanding or your deductions or your inferences do not coincide with the Court's, then you are to disregard what the Court may have said and rely entirely upon your own recollection of what the evidence is, because it is your recollection and not the Court's which must control."

We conclude that the instructions were eminently fair to the defendant in presenting the issues to be determined by the jury.

■■ It is finally argued that the defendant was denied a fair trial because he was not given time to properly prepare for trial. The short answer to this contention is that at the time the case was called for trial defendant made no motion for a continuance. Prior to commencement of trial he had sought

and was granted two continuances and there is no ruling of the court adverse to him on the contention now for the first time here urged. The record now shows that he was indicted February 14, 1957. He was arrested and taken before the United States Commissioner February 22, 1957, at which time he was, of course, fully informed of the charges against him and the following day was released on bond. On March 18, 1957, he was arraigned and a jury was impaneled on that date but trial did not commence until March 20, 1957. The contention that defendant was deprived of his constitutional right to a fair trial because arraignment and impaneling of the jury took place the same day is wholly without merit.

On the entire record we are convinced that the defendant was given a fair trial and the judgments appealed from are therefore affirmed.