**Louis Clifton HESS, Donald Kilsmuth Hess and Lewis Milton Williams, Appellants,**

**v.**

**UNITED STATES of America, Appellee.**

No. 15831.

United States Court of Appeals
Eighth Circuit.

April 11, 1958.

Louis Clifton Hess, Donald Kilsmuth Hess and Lewis Milton Williams, pro se.

Edward L. Scheufler, U. S. Atty., and Kenneth C. West, Asst. U. S. Atty., Kansas City, Mo., for appellee.

Before SANBORN, WOODROUGH and MATTHES, Circuit Judges.

MATTHES, Circuit Judge.

Count I of an indictment filed in the United States District Court, Western District of Missouri, on November 28, 1956, in substance charged that on November 11, 1956, all three appellants violated Title 18 U.S.C. § 1201 by unlawfully kidnapping, for ransom, reward or otherwise, and by transporting in interstate commerce from Kansas City, Jackson County, Missouri, into Mission, Johnson County, Kansas, one Raymond Isrial Brasfield, who thereafter was liberated unharmed. Count II of the indictment charged, in substance, that appellant Lewis Milton Williams, on November 12, 1956, violated Title 18 U.S.C. § 1201 by unlawfully kidnapping for ransom, reward or otherwise, and by transporting in interstate commerce from Mission, Johnson County, Kansas, into Kansas City, Jackson County, Missouri, one Dorothy Stone Sparks and her minor son, Stephen Sparks, who thereafter were liberated unharmed.

A jury found Louis Clifton Hess, Donald Kilsmuth Hess and Lewis Milton Williams guilty on Count I and Williams guilty on Count II. In due time, judgment was rendered by the court committing each appellant for imprisonment for a period of the rest of his natural life on Count I of the indictment and appellant Williams for a like term on Count II thereof. From this judgment appellants have appealed to this Court.

The indictment and proceedings subsequent thereto grew out of this state of facts:

### Count I.

Raymond Isrial Brasfield, 21 years old at trial time, was employed as a taxicab driver by the Toedman Cab Co. in Kansas City, Missouri, and at about 8:39 p. m. on November 11, 1956, pursuant to a call, drove to 39th and Troost in that city where he picked up three men. Brasfield positively identified the three men as appellants and pointed them out in the courtroom. After entering

the cab, the three men "drawed their guns on me" and thereafter Brasfield was directed by his captors to drive them over various streets in Kansas City, Missouri, and Kansas City, Kansas. (The route was detailed by Brasfield in his testimony.) Brasfield testified that on a side street in Kansas City, Kansas, he was placed in the trunk compartment of the taxicab by appellant Donald Kilsmuth Hess, and forced to remain there while the cab was driven about for approximately five minutes. Then Brasfield was removed from the trunk and forced to drive the three back to Kansas City, Missouri, where he was again placed in the trunk of the vehicle, this time by Williams. After three, four or five minutes, during which "they drove around," Brasfield was released from the trunk, and directed to drive the appellants back to the State of Kansas, which he did, stopping at 35th and Matney Streets, where he was, for the third time, placed in the trunk by appellant Donald Kilsmuth Hess, and kept there about five minutes. When released, and at the command of his abductors, Brasfield drove to the vicinity of Highway 58 and Merriam Lane where Nigro's Super Market is located. The men talked about holding up the market. They drove by Nigro's twice and then "went on down the line" where there was another super market which they (Brasfield's captors) talked about "holding up." About that time another taxi "came along and honked at us because I wasn't supposed to be over there, * * * and we took off * * * and went east to Mission." At Johnson Drive and Lamar Road, in that city, a patrolman undertook to stop them whereupon, his captors directed Brasfield to "step on it, to get going. I just kept right on going and went as fast as I could go * * *." At 58th and Reeds Road the motor in the cab died and the three men "jumped out and took off running." This occurred about 12:30 a. m., November 12, 1956. In a short time the patrolman appeared and Brasfield told him what had occurred.

It also appears from Brasfield's testimony that when the men entered his cab, one of them carried a blue suitcase which appeared to be made of either plastic or metal. He also described the guns as a "silvery looking pistol, a sawed-off shotgun and a dark revolver." Brasfield stated that two of the men had light colored hats, one had a dark brown hat; they were all wearing light tan trench coats, light tan pigskin gloves, and he identified three trench coats and a pair of gloves offered as exhibits, as having the same appearance of those worn on the eventful night. In addition, he identified a flashlight, also offered as an exhibit, as being identical to the one his captors had.

Edward M. Rice, police officer for Mission, Kansas, testified that he had pursued the cab driven by Brasfield on the night of November 11, and that he unsuccessfully undertook to stop the cab. At that time he noticed two men in the front seat and two in the rear seat; that shortly thereafter he came upon the cab which was stopped near 57th and Reeds. Later he talked to Mr. A. H. Hamilton, who lived at 5728 Reeds Road in Mission, who showed witness Rice a suitcase and shoulder holster which Hamilton found leaning against the back of his building on the morning of November 12, 1956. The suitcase previously identified by Mr. Brasfield was also identified by the police officer as having the appearance of the one found by Mr. Hamilton.

The Government established by Robinson Field, special agent of the Federal Bureau of Investigation, that a thorough terrain search made by him and ten other officers on November 12 and 13 began in the neighborhood of 5738 Reeds Road, where the cab was abandoned, and was continued in that area. As the result of this search, a receipt from the Alcazar Hotel in Kansas City, Missouri, dated November 6, 1956, issued to one Edward Walsh for $14 for rent from November 6 to November 13 was found; that the officers also found other articles

offered in evidence as Government exhibits consisting of trench coats; a double-barrelled, sawed-off shotgun, fully loaded when found; two rolls adhesive tape; cartridge belt with shotgun shells; sweat shirt sleeves with two slits cut therein for eyes, and another roll of adhesive tape.

The manager of the Alcazar Hotel, Kansas City, Missouri, testified that he personally signed the receipt found by the officers; that he recalled the person who used the name "Edward Walsh" occupied room 716 from November 6 to November 13, 1956, and identified appellant Lewis Milton Williams as the person whom he knew as Ed Walsh and to whom he gave the receipt. He also stated that he recalled when Williams left the hotel he had a grip or suitcase similar to the one offered as a government exhibit.

It was further shown that Williams was taken into custody at about 5:20 p. m. on the afternoon of November 13, 1956, at the Sherman Hotel, 9th and Locust Streets, Kansas City, Missouri. Williams admitted to the arresting Special Agents that he arrived in Kansas City, Missouri, on November 6, 1956, and registered at the Alcazar Hotel as Edward Walsh and that he moved to the Sherman Hotel on November 13, 1956. The special agents found a number of items in possession of Williams, consisting of a .38 caliber, bone-handled Colt revolver; large blue suitcase; two rolls of one-inch Rexall tape, one roll of Rexall tape and one roll of two-inch Red Cross tape; pair of pigskin gloves; light color felt hat; and light tan trench coat, all being Government exhibits that were introduced in evidence.

Louis Clifton Hess was the only appellant to testify, and according to his testimony, he and his brother Donald arrived in Kansas City, Missouri, from the state of California about November 6, 1956. Louis registered in the Gladstone Hotel under the name of James Collins and Donald under the name of Bob Watson. Louis stated he always registered "under a phony name in a

hotel in case anything happens, any kind of a scandal, well, I wouldn't be involved." Louis further testified that on the night of November 11, 1956, he and his brother went to a theater where they stayed watching the show "Oklahoma" until after midnight; that upon leaving they went directly to their hotel and retired. Louis denied knowing appellant Williams and stated his brother Donald had told him that he did not know Williams and that neither had seen him prior to the time of their arrest.

In rebuttal the Government offered Beverly Peterson who testified that on November 6, 1956, she met appellant Williams who was accompanied by appellant Donald Hess, known to her as "Bob"; that on the night of November 8, 1956, she had dinner with Williams and Donald Hess; that she saw Williams on at least three different occasions and that Donald Hess was in Williams' company on two of the occasions.

### Count II.

To sustain this count of the indictment, the Government offered Dorothy Stone Sparks, who testified that she resided at 5706 Beverly Street, Mission, Kansas, with her husband and son Stephen, almost two and one-half years of age; that her home is about five or six blocks southwest from the intersection of 58th and Reeds Road. (Point where taxicab stalled and from which the three men fled.) At approximately 8:30 on the morning of November 12, 1956, and after her husband had left for his work, Mrs. Sparks started down the steps to the basement behind her son, when she was confronted with a man who had a gun pointed at her. When Mrs. Sparks screamed, the man "clapped his hand over my mouth and said in effect, 'that is the last thing you want to do, lady.' " At the direction of her accoster, Mrs. Sparks obtained the keys to the automobile, and thereafter she remained in the kitchen of their home for about an hour and a half, during which time she read to her son Stephen to keep him from crying. During this interval the man, whom she pointed out in the courtroom

as appellant Williams, carried on some conversation and on occasion pointed the gun at her. Her captor decided he wanted to be driven to the downtown area of Kansas City, Missouri, and informed Mrs. Sparks she could either drive him down or he would tie her and Stephen and tape their mouths so that he would have a chance to get away. She decided to drive. Before leaving, and at his request, Mrs. Sparks gave him a paper bag, into which he placed bullets and tape. She also observed that he dropped the sleeve from a sweat shirt on the kitchen floor. In accordance with instructions from her captor, Mrs. Sparks, accompanied by her son, drove him to a point in front of Macy's in Kansas City, Missouri, where he got out of the automobile. During the trip he informed Mrs. Sparks that she should go home and not call the police; that he "was not alone in this and that there were others with him * * *." Mrs. Sparks identified the trench coat, offered as an exhibit, as being similar to the one worn by this man on the day in question, and also identified the sweat shirt sleeve, also a government exhibit, as having the same appearance as the one dropped in her home.

A special agent of the Federal Bureau of Investigation identified the sleeve from the man's sweat shirt as an item which the agent found on the kitchen floor of the Sparks home when the agent was there conducting an investigation. The same agent also identified the paper bag, offered as a government exhibit, as the one he found on the floor of the Sparks' automobile.

By the chief fingerprint technician of the police department of Kansas City, Missouri, it was shown that the right thumb print of appellant Williams was found on the paper bag.

No evidence was offered by Williams on Count II of the indictment.

■ The substance of the first point presented is that the court committed errors during trial prejudicial to the rights of appellants. We are unable to determine from the brief wherein or in what manner prejudicial error was committed, and we construe the broad assignment as an invitation to search the record for error, which we are not required to do. Rule 11(b) of the Rules of the United States Court of Appeals, 8th Cir., Title 28 U.S.C.A., provides that if a point relates to the admission or exclusion of evidence, the statement shall quote the evidence referred to, and any objections or other equivalent action taken relative thereto, together with rulings of the court thereon, giving the pages of the printed record on which the quotations appear; and also requires the brief to contain a concise statement of each point to be argued. In the recent case of Bell v. United States, 8 Cir., 251 F.2d 490, this court reiterated the well-established rule that we need not consider assignments of error not stated in accordance with our rules, particularly in situations where the departure from the rules is flagrant, and we cited Hoyer v. United States, 8 Cir., 223 F.2d 134, 136; Winebrenner v. United States, 8 Cir., 147 F.2d 322, 324, certiorari denied, 325 U.S. 863, 65 S.Ct. 1197, 89 L.Ed. 983; Marx v. United States, 8 Cir., 86 F.2d 245, at page 251; Gray v. United States, 8 Cir., 14 F.2d 366, 368. While it is obvious that the rule, in the particulars noted, was disregarded in the preparation of the brief, we nevertheless find interspersed in the argument portion thereof, statements indicating that appellants complain of an illegal arrest; the introduction of evidence relating to other offenses committed by them, and the introduction of certain exhibits. Because of the severity of the punishment, and, inasmuch as appellants' brief was apparently prepared without assistance of counsel, we have, in the interest of justice, diligently searched the record and are convinced that the rights of appellants were not violated in the respects suggested.

■■ *With respect to the alleged illegal arrest.* Appellant Louis Clifton Hess testified that on November 14, 1956, he and his brother were arrested by Federal Bureau of Investigation officers;

and, according to testimony of a special agent, Williams was arrested on the day previously. The indictment was filed November 28, 1956, and order for warrant of arrest was issued on November 29, 1956. While the record does not disclose that warrants were in possession of the officers when the arrests were made, or if issued, that the arresting agents of the F.B.I. informed appellants of the offense charged and that a warrant had been issued, Rule 4(c) (3) Federal Rules of Criminal Procedure, Title 18 U.S.C.A. nevertheless the contention is without merit. Title 18 U.S.C.A. § 3052 clothes agents of the Federal Bureau of Investigation with authority to make arrests without warrant for felonies cognizable under the laws of the United States, where the agent making the arrest has reasonable grounds to believe that the person arrested is guilty of a felony and there is likelihood of his escaping before a warrant can be obtained for his arrest. The record here discloses that as the result of a careful and exhaustive investigation of the offense, for which appellants were indicted, strong circumstantial evidence and other facts were obtained by the arresting agents which furnished reasonable grounds for an honest belief that the appellants had committed the felonies for which they were eventually tried and convicted, and that unless they were apprehended they were likely to escape. See and compare Coplon v. United States, 89 U.S.App.D.C. 103, 191 F.2d 749, certiorari denied, 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690. Moreover, appellants failed to attack the jurisdiction of the court over their persons by pretrial motion as required by Rule 12(b) (2) Federal Rules of Criminal Procedure. Title 18 U.S.C.A. Indeed, the record discloses that at no time during the pendency of the case or the trial thereof did able lawyers for appellants, appointed by the Court, question the court's jurisdiction over their persons. In this situation they waived such objection. Pon v. United States, 1 Cir., 1948, 168 F.2d 373, 374, and cases cited; United States v. Rosenberg, 2 Cir., 195 F.2d 583, certiorari denied 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 687, rehearing denied, 344 U.S. 889, 73 S.Ct. 134, 97 L.Ed. 687; Bistram v. United States, 8 Cir., 253 F.2d 610.

*With regard to evidence of other crimes.*

A painstaking examination of the voluminous record fails to disclose any evidence establishing that appellants or either of them committed or was involved in the commission of other offenses; therefore, this contention must fail.

*With regard to introduction of exhibits.*

As we understand appellants' brief, they contend that the court improperly permitted certain articles of personalty to be introduced as evidence which had been obtained by special agents of the Federal Bureau of Investigation as the result of a claimed unlawful search and seizure. Apparently they refer to the items found in the room of appellant Williams after he had been arrested, enumerated in the statement of facts above set out.

The Fourth Amendment to the Constitution prohibits unreasonable searches. Kernick v. United States, 8 Cir., 242 F.2d 818, 820 and cases cited. In the Kernick case, we stated, loc. cit. 820:

"The Fourth Amendment does not require that every valid search and seizure be effected under the authority of a search warrant. 'Search and seizure incident to lawful arrest is a practice of ancient origin and has long been an integral part of the law-enforcement procedures of the United States and of the individual states.' Harris v. United States, supra [331 U.S. 145, at pages 150–151, 67 S.Ct. 1098, at page 1101, 91 L.Ed. 1399]. The applicable rule is stated in Carroll v. United States, 267 U.S. 132, 158, 45 S.Ct. 280, 287, 69 L.Ed. 543, as follows: 'When a man is legally arrested for an offense, whatever is found upon his person or in his control which

it is unlawful for him to have and which may be used to prove the offense may be seized and held as evidence in the prosecution.' "

■ It is clear from the record that the search which led to the discovery of the revolver, tape and other items was within the "permissible area of search" and was reasonable. We have seen that the arrest of Williams, made before the search, was lawful; the articles found were under his possession and control and as stated in Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct. 4, 5, 70 L.Ed. 145, followed in Kernick v. United States, supra, 242 F.2d loc. cit. 820, were the type of things " * * * connected with the crime as its fruits or as the means by which it was committed, * * *."

■ The point is also made that the court misinterpreted the law in charging the jury that it was not necessary, in order to find the appellants guilty that the victims were kidnapped, held and transported in interstate commerce for a reward or ransom. Appellants would have us construe the Kidnapping Statute, Title 18 U.S.C.A. § 1201, particularly the words "or otherwise" appearing therein to mean that as a prerequisite to a guilty verdict the jury had to find that the kidnapping was carried out to enable the offenders to derive a personal gain in the nature of a reward or ransom. This contention is wholly without merit. In Gooch v. United States, 297 U.S. 124, 56 S.Ct. 395, 80 L.Ed. 522, the history of the act was reviewed and it was there held that Congress intended to prevent transportation in interstate commerce of persons who were being unlawfully restrained in order that the captor might secure some benefit to himself. Apropos to the instant contention is this pronouncement at page 128 of 297 U.S., at page 397 of 56 S.Ct.:

"Holding an officer to prevent the captor's arrest is something done with the expectation of benefit to the transgressor. So also is kidnaping with purpose to secure money. These benefits, while not the same, are similar in their general nature and the desire to secure, either of them may lead to kidnaping. If the word 'reward,' as commonly understood, is not itself broad enough to include benefits expected to follow the prevention of an arrest, they fall within the broad term, 'otherwise.' "

In Brooks v. United States, 4 Cir., 199 F.2d 336, the contention was made that no violation of the kidnapping statute was alleged or proven because the abduction and transportation of the persons flogged was not for ransom or reward or other benefit to appellants. The court ruled the point adversely to appellants, and held on the authority of the Gooch case that under the act Federal Jurisdiction extends to persons who have been kidnapped and held, not only for reward, but for any other reason. This Court, in Sanford v. United States, 8 Cir., 169 F.2d 71, being concerned with a similar contention, held contrary to the theory advanced by appellants.

■ As we understand the brief of appellants, they contend the United States District Court for the Western District of Missouri lacked jurisdiction to try Count I of the indictment apparently on the theory that the actual kidnapping took place in Johnson County, Kansas. As observed, victim Brasfield was kidnapped in Jackson County, Missouri, and transported into the state of Kansas, whereas, Count II charged and the evidence in support thereof proved that the kidnapping occurred in Kansas and the victim was taken into Missouri. A sufficient answer to this assignment lies in Title 18 U.S.C.A. § 3237 which provides:

"Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

"Any offense involving the use of the mails, or transportation in interstate or foreign commerce, is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce or mail matter moves. June 25, 1948, c. 645, 62 Stat. 826."

Inasmuch as the offense under Count I was begun in Missouri and finally completed in Kansas and under Count II begun in Kansas and completed in Missouri, the court was clothed with jurisdiction, and the point must be rejected.

 It was also asserted throughout appellants' brief that because of the short lapse of time between the date of the commission of the offenses and the time of trial, they were denied the opportunity to properly prepare their defense and hence were denied a fair trial. A complete answer to this contention lies in the fact that appellants at no time requested the court for a continuance or for more time in which to prepare for trial. Through their lawyers, appellants filed four separate pretrial motions, but in none was there a request made for a continuance, neither was there a suggestion made that additional time was needed to prepare for trial. See Picciurro v. United States, 8 Cir., 250 F.2d 585 where this court dealt with a situation strikingly similar on the facts.

Finally, the statement repeatedly appears in appellants' brief that the punishment imposed was so severe as to constitute cruel, unusual and excessive punishment.

The Kidnapping Statute, Title 18 U.S.C.A. § 1201, authorizes punishment by death if the kidnapped person has not been liberated unharmed, and if the verdict of the jury shall so recommend, or punishment by imprisonment for any term of years or for life, if the death penalty is not imposed. The punishment fixed by the court was authorized by the statute. As stated by this Court in

Affronti v. United States, 8 Cir., 145 F.2d 3, 10:

"This Court cannot concern itself with the question of the reasonableness of the sentence. 'Where a District Court imposes a sentence authorized by a statute of the United States, it commits no error of law.' Holmes v. United States, 8 Cir., 115 F.2d 528, 529; Johnson v. United States, 8 Cir., 126 F.2d 242, 251; Holmes v. United States, 8 Cir., 134 F.2d 125, 135."

From a careful examination of the entire record, it is our conclusion that no errors of law affecting the substantial rights of the appellants occurred during the trial, and consequently the appellants are not entitled to have the conviction set aside.

The judgment appealed from is affirmed.