**William Cecil POOL, Appellant,**

v.

**UNITED STATES of America,**
Appellee.

No. 15865.

United States Court of Appeals
Ninth Circuit.

Oct. 13, 1958.

**58**

Morton Galane, Las Vegas, Nev., for appellant.

W. Wilson White, Asst. Atty. Gen., Harold H. Green, D. Robert Owen, Attorneys, Department of Justice, Washington, D. C., Howard W. Babcock, U. S. Atty., Las Vegas, Nev., for appellee.

Before STEPHENS, Chief Judge, and FEE and BARNES, Circuit Judges.

BARNES, Circuit Judge.

Appellant, one time Chief of Police of North Las Vegas, Nevada, was indicted on two counts of violating 18 U.S.C. § 242, which reads, in material part:

> "Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State * * * to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States * * * shall be * * * imprisoned not more than one year. * * *"

Appellant was convicted by jury verdict on both counts. A motion for new trial was denied by the trial court and appellant was sentenced to one year imprisonment concurrently on each count. He appeals here, 28 U.S.C. § 1291; 18 U.S.C. § 3772, on the following grounds:

### I. Errors Charged

**A. Errors in Introduction of Evidence**

(1) Error in refusing to strike from evidence a "voluntary statement" of the District Attorney of Clark County.

(2) Error in permitting testimony of appellant's wife (at the time, though later divorced) as to the manner in which appellant talked to a prisoner in her presence, over the objection such communications were privileged.

(3) Error in rejecting and later admitting a prior inconsistent statement of a prosecution witness.

**B. Errors in Instructions to the Jury**

(1) Failure to instruct the jury so as to explain and name the offense (even though appellant failed to except to the failure).

(2) Material variance between proof and indictment which was raised at end of government's case (but not at end of trial).

(3) The trial court "amended the indictment" in its charge to the jury (although no objection was made by appellant at the trial).

### C. Error in Refusing to Grant New Trial

### II. The Indictment

Because of the "variance" and "amendment" claimed, it is necessary to consider the form of the respective counts of the indictment.

Count I charged that Pool, as "Chief of Police," and his original co-defendant, Clifton (who turned state's evidence at the trial), as "Captain of Police," did, on February 27, 1956, in Clark County, Nevada,

" * * * while acting under color of the laws, statutes, ordinances and regulations of the State of Nevada * * * creating the offices and positions aforesaid and prescribing the duties thereof, wilfully subject Ray Lewis Sage, Jr., an inhabitant of the State of West Virginia, to the deprivation of the rights and privileges secured to him and protected by the Fourteenth Amendment to the Constitution of the United States not to be deprived of his liberty without due process of law, to-wit, (1) *the right and privilege to be secure in his person while in the custody* of anyone acting under the color of the laws of the State of Nevada, (2) *the right and privilege to be immune from force and violence by anyone* exercizing the authority of the State of Nevada or acting under color of its laws *for the purpose of obtaining a confession, statement, or information* about an alleged offense, and (3) *the right and privilege to be tried for an alleged offense by due process of law* and if found guilty *to be sentenced and punished in accordance with the laws of the State of Nevada, and not to be subjected to illegal punishment, force and violence* by any person acting under color of the laws of the State of Nevada;

"*That is to say, that at the time and place aforesaid, the defendants,* William Cecil Pool and Edward Ellis Clifton, *while acting under color of law as aforesaid, did beat with a flashlight, fists and elbows, and did kick with their feet* the said Ray Lewis Sage, Jr., all for the purpose and with the intent of depriving him of the Constitutional rights aforesaid.

"In violation of Section 242, Title 18, United States Code." [Emphasis and figures in parentheses added.]

The second count charged that on the same date and in the same Clark County, Nevada, acting under the same color of law as Chief of Police, Pool, alone, had deprived Coite Martin Gaither, Jr., an inhabitant of the State of South Carolina, of the same three "rights and privileges":

"That is to say, that at the time and place aforesaid, the defendant, William Cecil Pool, while acting under color of law as aforesaid, did beat with fists and elbows, and did kick with his feet the said Coite Martin Gaither, Jr., all for the purpose and with the intent of depriving him of the Constitutional rights aforesaid.

"In violation of Section 242, Title 18, United States Code."

### III. The Evidence

Several burglaries of grocery store markets had taken place in and about North Las Vegas, Nevada, prior to February 27, 1956. The principal booty collected by the burglars was slot machines.

In the early morning hours of February 27, 1956, an attempt was made to burglarize the Valley Market. Later that same morning of February 27, 1956, Sage and Gaither, two airmen from a nearby airbase, were taken into custody by North Las Vegas police officers and booked for "burglary investigation." Upon being questioned, they denied connection with any of the several recent burglaries in which slot machines had been taken from business establishments

According to Gaither, Chief Pool and Detective Carlson shortly after noon took Gaither for a ride in a police car. He was questioned further about the slot machine burglaries and refused to confess. At all times his hands were handcuffed behind him. The car was driven toward Nellis Air Force Base and off highway 91 onto a gravel road. Gaither testified Pool ordered him from the car, and then struck him in the face. Appellant and Carlson allegedly beat and kicked Gaither a number of times. He was knocked down six or eight times. Various threats were made. After an hour or so the party returned to the North Las Vegas Police Department where Gaither's face was observed to be "red and flushed."

Subsequently, Pool interrogated Sage at the Police Station. He then ordered Sage into a police car, and Clifton, Carlson and Pool got in. Sage states he was told to get down on the floor boards by the back seat. He was then not handcuffed. Again the car was allegedly driven three or four miles along the main highway, then off on a gravel side road. Sage was not handcuffed. He was ordered from the car and Clifton struck him first, with fist or elbow, and then continued to strike him with a flashlight "25 to one hundred times on the chest and abdomen" (Carlson estimates 60 to 70 blows with the flashlight). Sage stated he fell to the ground twenty times. Clifton asked him many times, "Are you ready to talk?" About the middle of this "interview" Sage says his hands were handcuffed behind him. He was taken to a little gulley. Pool asked him if he was ready to talk and then Clifton thrust a pistol to Sage's temple and said: "You had better talk." At one place in his testimony Sage testified Pool kicked him on the chest while he was down; at another place in his testimony he denies this. (Carlson testified Pool kicked Sage several times.) Sage said Clifton stamped on him while he was down.

Sage was taken back to the North Las Vegas station, then to the Henderson jail. There he fainted, and J. B. French, M.D.,

and Mayor of Henderson, was called to examine Sage. He found a bruised mouth, twelve to fifteen "long" bruises over his chest and abdomen, and smaller bruises on both wrists and one ankle. These "long" bruises were three to ten inches in length and an inch or one and one-half inches wide. Possible internal injury was diagnosed; possibly a fractured rib or ruptured spleen. Sage was hospitalized and given medication. Subsequent x-rays disclosed no broken bones and no proof of serious internal injuries.

Hospital records of the "Rose de Lima Hospital" were in evidence (Pltff's Ex. 7). They disclose that Sage, admitted at 10:05 P.M. on February 27, 1956, "complains of having been beaten in custody of NLV police." Two 8 x 10 black and white photographs of Sage were taken by the Clark County Sheriff's Office on February 29, 1956, (Pltff's Exs. 27, 28) which clearly showed numerous severe bruises on the chest and upper abdomen. On February 30, 1956 (sic), two colored still photographs of Sage were taken by the Clark County Sheriff's Office (Pltff's Ex. 26) which vividly show the bruises.

At 9:45 P.M. on February 27, 1956, before entering the hospital, and shortly after he was first seen by Dr. French in the Henderson jail, the latter interviewed Sage as to the cause of his bruises. The questions and answers were taken down by a stenographer, transcribed, and signed and sworn to by Sage (Dft's Ex. A). The questions and answers were asked and given in the presence of Dr. French, a Dr. Coogan, and Jacqueline W. Williamson, the Notary.

"Q. How did this (marks on chest) occur? A. It occurred when the North Las Vegas Police used the end of a flashlight on me."

The questions and answers were few in number, but Sage referred to three men "working on him," he didn't know for sure who the policemen were; thought the Chief of Police took him in a gulley; referred to the gun at his head, the threats, the handcuffs, the flashlight, etc.

Dr. French testified at the trial. Among other things, he testified there was no sand or gravel on any of Sage's injuries; that only the injury in Sage's left cheek could be considered "an abrasive burn"; that the bruises he saw could have occurred in jumping from a car only if the person had hit a gate pipe.

Gaither, at about 8:00 P.M. on February 27, 1956, was taken from the Las Vegas jail to the North Las Vegas jail. There he was confronted by officers Pool, Clifton, Carlson, and two of his former associates, Barbara and Frank Ferola, together with a "sack full of change," (apparently the money and sack which were the proceeds of one robbery), and "some papers." Gaither read "the papers" and confessed burglaries of the Foodland and Little Giant Markets, and an attempt to burglarize the Valley Market. He told the Chief he would tell him where the slot machines were, and as well, where he had placed the crowbar used to enter the markets. The officers looked for the crowbar, but couldn't find it. They located the slot machines and "some loose change on the ground."

Gaither then admitted burglarizing the Buzzens Market and the Lincoln Market, but denied burglarizing the 101 Club, the Rustic Inn and about six other places. Gaither then dictated and signed a confession to the burglaries previously confessed.

On the evening of February 28, 1956, Sage was brought from Henderson to North Las Vegas. He was told of Gaither's confession; he read it, and Sage confessed to his participation in the burglarization of three markets. He signed a written statement to that effect.

Sage was also asked by some police officer to make a statement he had received his bruises by jumping from an auto going fifty miles per hour. He finally agreed, under Clifton and Pool's coaching, to say he fell with a slot machine on his chest. He wrote in his own handwriting and signed a statement to this effect, i. e., that he had not been mistreated by the police, that he had fallen with a slot machine on top of him (Dft's Ex. B).

Both Gaither and Sage pleaded guilty in state court to the burglaries charged against them, and were sentenced to one to fifteen years in the Nevada State prison. Their sentence was commuted to ten months.

The Booking Report on Gaither was filed by the City of North Las Vegas Police at 4:30 P.M. on February 27, 1956, Case A-2309 (Pltff's Ex. 6). Sage was booked at 5:00 P.M., Case #575 (Pltff's Ex. 5). At 8:44 P.M. the Radio Log of the North Las Vegas Police shows officer Carlson (Car 509) inquired: "What is the name of the 15 (code for prisoner) who needs medical care? Ans. Ray L. Sage."

At 11:00 P.M., officer Carlson made a supplemental Report in Case A-2309 (sic) (Dft's Ex. C), telling how Sage had attempted to jump from a police auto traveling 50 miles per hour, and was injured.[1]

1. "At approximately 2:30 P.M., Detective Carlson and Captain Clifton were taking a prisoner Ray Sage to the Henderson City Jail charged with burglary. On the way to Henderson, this subject stated he would show us where two slot machines were, where he had taken out of the 101 Club. He told us to drive east on College to Nellis Blvd. and turn south on Nellis Blvd. towards Boulder Highway. Subject was sitting on the right hand side of the back seat. Captain Clifton sat on the left hand side and Detective Carlson was driving the vehicle. We turned up on College on Nellis, we travelled approximately ½ mile when subject opened rear door and attempted to jump out of vehicle. Police car was traveling approximately 50 miles per hour. Captain Clifton grabbed a hold of subject and tried to hold subject in the police car and while subject was taking the jump, injured his mouth and complained that his side hurt him. Subject appeared to be O.K. en route to Henderson Jail and was booked there and lodged there. At the time this subject tried to jump out the rear door of the police car, he was handcuffed, his hands in the rear of him, subject also will be filed on for five counts of burglary." [Dft's Ex. C.]

It should be noted that on Sage's statement (Dft's Ex. B, p. 4, which told of Sage receiving his injuries when the slot machine fell on him) there was added, apparently as an afterthought: "while en route to Henderson I jumped out of the Police car and did not injure myself."

On March 3, 1956, Officer Carlson dictated and signed a detailed statement, telling how he had arrested Sage on the morning of February 27, 1956, when he "noticed one of his arms was skinned and bruised, and he appeared to be of a stiffness nature, or sore nature." (Dft's Ex. D, p. 1.) Carlson then told how he and Pool took Gaither for a ride in a police car, stopping six blocks off the main highway on a gravel road. Carlson then tells how he and Clifton took Sage in the police car to look for slot machines, and how Sage made an *attempt* to leap out of the car, but *how Clifton held him.* At no time does Carlson state Sage fell to the ground, but that he was injured "while taking the jump."

Carlson then explained in his statement how Mr. and Mrs. Frank Ferola had produced the stolen quarters, nickels and dimes, and reported to police that Gaither and Sage had committed the Foodland Market burglary; how Gaither and then Sage had admitted various burglaries; and how Sage had asked to speak to Pool alone and had then voluntarily written and signed his statement exonerating the police. (Dft's Ex. B.)

At the trial, Carlson testified on behalf of the prosecution and described in detail how he and defendant Pool took Gaither for "the ride" out on the desert, as Gaither had described, and how each had struck the prisoner, knocking him down "about three times," and how he, Pool and Clifton had taken Sage for a ride out on the desert as Sage had described; how Clifton had used his five cell flashlight to strike Sage 60 or 70 times; how Pool had kicked Sage in the back and ribs; how Clifton had placed his .45 automatic at Sage's temple; how Carlson himself had threatened Sage with a gun; that Sage had made no attempt to jump from the car; that he (Carlson) had made such

a report at Pool's request; that Pool had requested Sage to write his statement (Dft's Ex. B) exonerating the officers and "contradicting Dr. French"; that Chief Pool "would put the words in his mouth, what to put on the paper."

Ramona Wolf, typist and secretary of the Police Department of North Las Vegas, was married to defendant Pool from December 1955 to April 1956. She was asked to testify as to her observations, but was instructed no inquiries of her would be made "as to any communication, confidential or otherwise * * * had alone with the defendant Wm. Cecil Pool." She testified defendant Pool and Gaither went out the door of the Police Station together on February 27, 1956, and returned together an hour later. Thereafter she saw Sage, Clifton, Carlson and Pool in a police car in front of the station.

There was other testimony on behalf of the prosecution not particularly relevant here.

Defendant Pool did not take the stand in his own defense. He produced the following witnesses:

(1) Al Ferguson, a Police Commissioner of North Las Vegas, who testified that on the evening of February 28, 1956, he saw Sage making out a report (Dft's Ex. B) in the North Las Vegas station; that he was writing it out alone; that he had seen the marks on Sage's body; that Sage did not complain to him; that on February 28, 1956, he had heard Gaither confess the burglaries when confronted with the large sack of money the Ferolas had delivered to the police.

(2) Billy Richards Leeds, a former fellow officer (from January 13, 1956, to April 30, 1956), who, as Desk Officer, testified Sage did not leave the North Las Vegas Police Station from 9:00 A.M. until 2 or 3:30 in the afternoon when he left for the Henderson jail, and that Sage had not been mistreated. He had seen that Gaither had left the station on February 27, 1956, with Pool and Carlson for about an hour.

(3) Mrs. Phyllis Louise Harrison, operator of the Grande Motel in North Las

Vegas, who saw Mr. Sage engage in a fist fight on Sunday night, February 19, 1956.

Co-defendant Clifton had three witnesses briefly testify. Their testimony is here immaterial. Neither defendant took the stand.

It should be noted that there is no attack upon the sufficiency of the evidence to support the jury's verdict that the prisoners were beaten.[2] And indeed, there could be none. Not only was the evidence convincing beyond a reasonable doubt, it was overwhelming, both of the beating and of appellant's participation in it.

The leading case on the subject is Screws v. United States, 1945, 325 U.S. 91, 106, 65 S.Ct. 1031, 89 L.Ed. 1495. It is similar to Williams v. United States, 1951, 341 U.S. 97, 101, 71 S.Ct. 576, 579, 95 L.Ed. 774, which lays down the rule that:

"* * * where police take matters in their own hands, seize victims, beat and pound them until they confess, there cannot be the slightest doubt that the police have deprived the victim of a right under the Constitution. It is the right of the accused to be tried by a legally constituted court, not by a kangaroo court."

*IV. Discussion of Alleged Evidentiary Errors*

As to the alleged errors in the introduction or rejection of evidence, we consider each in turn.

■ (A) The witness George Dickerson, District Attorney of Clark County, Nevada, *called on behalf of defendant Clifton,* was subpoenaed to produce the statement of Ray L. Sage, dated February 28, 1956, which had been presented to the Nevada Grand Jury investigating the North Las Vegas Police Department. It was introduced as Defendant's Exhibit B, replacing original Defendant's Exhibit B of which it apparently was a duplicate original.

On cross-examination by counsel for the United States, the following question and answer was given:

"Q. Mr. Dickerson, I believe you testified this morning that you had participated in part in the matter of presentation of this matter to the Clark County grand jury. What did you mean when you said in part? A. I was not present during any time when the evidence was submitted. I was present outside after the conclusion of the matter. Questions as to the legal problems involved, as to what crimes, if any, could be determined by the grand jury were asked of me, at which time I informed the grand jury that it was without jurisdiction to entertain any action in this regard, in that the evidence adduced constituted at the most a misdemeanor offense; that the grand jury is an arm of the district court and can return an indictment only on matters tried with the district court." [Tr. p. 271.]

Counsel for Pool then objected in the following language:

"Mr. Watson: I think Mr. Dickerson's legal opinion in the matter of the State law of Nevada in the matter of the grand jury is not proper at all, as being prejudicial and should be stricken." [Tr. p. 271.]

The court then stated:

"Let me make this very obvious observation. Counsel are not permitted to sit idly by and allow inadmissible matter to go into the record and thereafter gamble on the chance of it being favorable or unfavorable and moving to strike. They are required to make objections to questions asked. Now this Court was aware of it as soon as that question was asked, but you didn't see fit to

2. Appellant does question the sufficiency of the evidence to support the verdict, but only on the theory that there was no evidence to prove the confessions were the immediate result of the beatings, and hence no violation of the statute proved.

make the objection. Objection overruled."

And after a question and answer:

"At this point, the Court would like to make this observation, in ruling on the motion to strike. I am sure you are not under the impression the Court treats a particular line of testimony, so any time you have objections, you make them." [Tr. p. 271, 272.]

Apparently appellant urges that the district attorney's statement that the grand jury was without jurisdiction, and "that the evidence constituted at most a misdemeanor offense," might have led the jury to infer that the failure of the grand jury to indict was based on its reliance on the district attorney's advice that it was without jurisdiction to indict, or that the district attorney had evaluated the evidence as sufficient to constitute a crime, to-wit: a misdemeanor. We doubt that this Federal jury was at all concerned with what the Nevada Grand Jury had or had not done. "The evidence in this case was not clear," says appellant. With this we cannot agree. At the time Mr. Dickerson's answer was made, the defendant, Pool, had rested his case. All his evidence was in. As we have stated above, in our opinion there was overwhelming evidence of defendant's guilt. We find no reversible error and nothing in Dickerson's answer that prevented a fair trial. Other cases cited in which prejudicial statements were made, do not make this statement prejudicial.

█ (B) Appellant·Pool's wife testified she heard Pool say to Gaither, in the course of his interrogation: "You are lying," and later, Pool said to Gaither, "Come on, we will go for a ride."

Both were statements made by Pool to Gaither, not to Pool's wife. They were made at a time when the husband, the wife, and a third person were present. They were not even asides to the wife in the presence of a third person. There is not the slightest reason to think that Pool was making a confidential communication to his wife, or any communication to her, or that he was concerned in the slightest whether his wife heard it. They were not confidential communications. Pereira v. United States, 1954, 347 U.S. 1, 6, 74 S.Ct. 358, 98 L.Ed. 435; Wolfle v. United States, 1934, 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617, affirming 9 Cir., 1933, 64 F.2d 566; Picciurro v. United States, 8 Cir., 1958, 250 F.2d 585; Wigmore, Evidence § 2336 (1940 ed.).

Appellant concedes there is no precedent directly in point in support of his position, and we suggest there exists an extremely good reason therefor.

█ Appellant raises his point by referring to "the *manner* in which appellant talked to a prisoner in her (his wife's) presence." But no question was asked of the wife concerning the *manner* in which Pool spoke to Gaither.[3] But if such questions had been asked, "The privilege, generally, extends only to utterances, and not to acts." Pereira v. United States, supra, 347 U.S. at page 6, 74 S.Ct. at page 361.

█ (C) Appellant charges error in the court's refusal to admit defendant's impeaching Exhibit C, and later reversing its ruling and admitting it. Both the rulings are proper. There was first a question as to whether the document offered was the original, and hence the best evidence; or whether it was in the files of the police department and hence an official document. The claim that the court abused its discretion by failing to admit it at the precise time appellant wanted it admitted is without merit, in view of its ultimate admission after a proper foundation had been laid.

3. Beyond anything discussed in the opinion, we have the fact that at the time of trial, Pool and his wife had been divorced. It is generally accepted law that such a divorce removes any bar of incompetency, but does not terminate the privilege. Pereira v. United States, 1954, 347 U.S. 1, 6, 74 S.Ct. 358, 98 L.Ed. 435.

*V. Discussion of Alleged Errors in Instructions*

█ In instructing the jury, the trial court first read the two counts of the indictment to the jury.

It will be remembered that there were three rights and privileges of which defendant allegedly deprived the two prisoners:

(1) "[T]he right and privilege to be secure in his person while in custody of anyone acting under color of the laws of Nevada,

(2) "the right and privilege to be immune from force and violence by anyone exercising the authority of the State of Nevada, or acting under color of its laws, *for the purpose of obtaining a confession, statement or information* about an alleged offense, and,

(3) "the right and privilege to be tried for an alleged offense by due process of law * * * and not to be subjected to illegal punishment, force and violence by any person acting under color of the laws of the State of Nevada." [Emphasis added.]

The instruction given by the court below covered all necessary aspects of the case.[4]

With one exception, we approve the instructions given as properly and carefully expressing the law. We shall consider that single instruction later.

Appellant urges that:

" * * * in the trial court's summary to the jury, only two elements were defined as requisite to a conviction; (1) whether the prisoners were in custody under color of law and (2) whether the appellant had a specific intent to deprive the prisoners of a Constitutional right." [Appellant's Brief p. 32.]

Such a statement not only overlooks all the other subjects hereinabove mentioned in note 4, but it carefully overlooks the first part of the "formula" instruction from which appellant quotes (1) and (2) above. This unquoted portion reads:

"*If you find the acts alleged in the indictment to have been committed,* then let me summarize the questions you have to determine." [Emphasis added.]

There then follows the quoted parts (1) and (2) above, and (3)—burden of proof beyond reasonable doubt.

There is no merit in appellant's position on the formula instruction.

█ Appellant then urges his principal point, that he was charged with obtaining confessions by force and violence and of depriving Sage and Gaither of their day in court. How can this be, says appellant, when the force and violence did not result in confessions and when no trial was necessary because Sage and Gaither pleaded guilty to the burglaries? This, says appellant, amounts to variance between proof and indictment, and caught him by surprise.

It apparently is appellant's position that no matter how badly prisoners may be beaten, if they refuse to confess, their rights have not been violated. It is only, says appellant, when prisoners confess immediately after or during the beating that 18 U.S.C. § 242 has been violated!

We point out that defendant was not charged with obtaining a confession by force and violence, but, among other things, with the use of force and violence, under color of law, "*for the purpose* of obtaining a confession, statement, or information about an alleged offense." [Emphasis added.]

█ Once we admit, arguendo, that *the beatings took place under color of law,* there can be no question but that

─────────────

4. These included the presumption of innocence, reasonable doubt, color of authority, distinction between personal and individual acts, and the illegal use of

power possessed by virtue of office; color of state law; the essential specific wilful intent, the materiality of intent, the credibility of witnesses, etc.

their purpose was to obtain "a confession, statement or information about an alleged offense." That no confession was obtained is immaterial.[5] The very language quoted by appellant from Apodaca v. United States, 10 Cir., 1951, 188 F.2d 932, 936, affirms this. Again, the indictments quoted with approval by appellant from United States v. Jackson, 8 Cir., 1956, 235 F.2d 925 and United States v. Walker, 5 Cir., 1954, 216 F.2d 683 (Appellant's Brief p. 40) show that "the right to be secure" and "the right not to be assaulted" and "the right not to be subjected to punishment without due process of law" were properly charged against appellant in each count in this case.

There is but one point worthy of serious consideration in appellant's appeal to this court. At one point, apparently in recapitulation, the trial court said:

"But, as I said, if Sage and Gaither were taken into custody by the defendants, under color of law, by reason of the positions held by the defendants, *then the ordeal to which the defendant Pool subjected both Sage and Gaither* and the ordeal to which the defendant Clifton subjected Sage at a point near Nellis Air Force Base constituted a violation of the Federal Statute." [Tr. p. 14.] [Emphasis added.]

This instruction assumes one of the very facts in issue: that Pool did beat Sage and Gaither. Were this the only instruction on this factual issue, we would be faced with a difficult problem: Did the trial court wrongly take a factual issue away from the jury? But the court in other instructions correctly instructed the jury that the question of whether or not the defendant Pool had so conducted himself was a question of fact for their determination. The trial court did so specifically, first in his instructions with respect to the presumption of innocence, and secondly, in the formula instruction hereinbefore quoted.

It should first be noted that the defendant at no time objected or took exception to the instructions as given; nor to any of the three matters now charged as error in connection with the instructions. Appellant recognizes the general rule that a failure to object deprives the defendant of the right later to challenge the instructions. Fed.R.Crim. P. 30, 18 U.S.C.[6] It is not even incumbent on this court to consider the alleged error when no objection was at any time made at the trial to the instruction now objected to by appellant. White v. United States, 5 Cir., 1952, 200 F.2d 509; Cosenza v. United States, 9 Cir., 1952, 195 F.2d 177.

Of course, this court has the authority, under Rule 52(b)[7] to recognize any error, whether objected to or not, as plain error (as distinguished from harmless error), or as a defect affecting substantial rights.

Upon the evidence here before us, both of the three eyewitnesses and the strong and substantial physical evidence; the instructions that were given; we have no hesitation in ruling that the instruction noted above constituted error which does not affect substantial rights, and hence is harmless error and is to be disregarded.

The very point now before us, *i.e.*, an instruction the language of which as-

5. We will not consider or comment here on the cause and effect, if any, between the beatings and the confessions occurring within hours thereafter.

6. " * * * No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. * * *" Fed.R.Crim.P. 30.

7. "(a) **Harmless Error.** Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

"(b) **Plain Error.** Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Fed.R. Crim.P. 52.

sumed the fact of the assault by the defendant on his prisoner, has been ruled on in a similar case (*i.e.*, a prosecution under 18 U.S.C. § 242). In Apodaca v. United States, supra, 188 F.2d at page 937, Judge Bratton said:

"It is further urged that the court erred in its instructions in assuming that the defendants made an assault upon Byrd. No exception was taken to these portions of the instructions. Rule of Criminal Procedure 30, 18 U.S.C. provides among other things that no party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection; and Rule 52(b) provides that plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court. The two rules are to be construed together. Construing them in that manner, it is recognized law that ordinarily errors in the charge of the court are not open to review on appeal unless the matter was brought to the attention of the trial court by exception as required by Rule 30, but that notice may be taken of a grave error which amounts to the denial of a fundamental right of the accused even though no exception was taken. Ryles v. United States, 10 Cir., 172 F.2d 72; judgment vacated apparently on other ground, 336 U.S. 949, 69 S.Ct. 882, 93 L.Ed. 1104. No grave error amounting to the denial of a fundamental right is presented here, and therefore the question is not open to review."

Cf. also United States v. Cioffi, 2 Cir., 1958, 253 F.2d 494, 496; Palmer v. United States, 10 Cir., 1955, 229 F.2d 861; Brown v. United States, 9 Cir., 1955, 222 F.2d 293; Obery v. United States, 1954, 95 U.S.App.D.C. 28, 217 F.2d 860, certiorari denied 349 U.S. 923, 75 S.Ct. 665, 99 L.Ed. 1255; Las Vegas Merchant Plumbers Ass'n v. United States, 9 Cir., 1954, 210 F.2d 732, certiorari denied 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645, rehearing denied 348 U.S. 889, 75 S.Ct. 202, 99 L.Ed. 698.

*VI. Refusal to Grant New Trial*

A motion for a new trial is addressed to the sound judicial discretion of the trial court, and its action thereon will not be reviewed on appeal except in case of clear abuse of such discretion. Steiner v. United States, 9 Cir., 1956, 229 F.2d 745, certiorari denied Pursselley v. U. S., 351 U.S. 953, 76 S.Ct. 845, 100 L.Ed. 1476, rehearing denied 352 U.S. 860, 77 S.Ct. 24, 1 L.Ed.2d 70; Apodaca v. United States, supra, 188 F.2d at page 940; Grover v. United States, 9 Cir., 1950, 183 F.2d 650.

The denial of these motions did not constitute an abuse of discretion.

The judgment is affirmed.