**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Edward Lee HON, Defendant-Appellant.**

**No. 13624.**

United States Court of Appeals
Seventh Circuit.

July 2, 1962.

Swygert, Circuit Judge, dissented.

Charles R. LeMaster, Fort Wayne, Ind., for appellant.

Alfred W. Moellering and Philip Carlton Potts, U. S. Attys., Joseph F. Eichhorn, Asst. U. S. Atty., Fort Wayne, Ind., for appellee.

Before DUFFY, SCHNACKENBERG and SWYGERT, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Edward Lee Hon, defendant, has appealed from a judgment of the district court, sentencing him to imprisonment for not more than 5 years, and provid-ing that he be confined for a period of six months and that the remainder of the sentence be suspended and the defendant during the latter period placed on probation. The judgment was based upon a finding by the court that defendant was guilty, as charged in an amended information, of violating the White Slave Traffic Act, 18 U.S.C.A. § 2421 (the Mann Act), in knowingly transporting in interstate commerce from Reno, Nevada, to a point in Allen County, Indiana, Irene Silina Britton, herein referred to as Irene, for the purpose of prostitution and debauchery and for other immoral purposes, and with the intent and purpose to induce, entice and compel her to give herself up to debauchery and to become a prostitute. Defendant pleaded not guilty and, being a pauper, was represented by court-appointed counsel, who also appears in this court.

The evidentiary facts are not in dispute, having been established principally by the testimony of Irene, a witness for the government.

Irene hitchhiked from her home in Laurel, Maryland, to Reno, Nevada, and began practicing prostitution. There she met defendant and they proceeded to reside together in the home of Mr. and Mrs. Norman Rice, for two or three weeks, during which time Irene continued in her prostitution activity. Their only income was that which Irene thus earned.

They left Reno together on a strange odyssey to her home in Maryland, where her child was in her parents' household. They rode in defendant's old automobile to Flagstaff, Arizona, where they resided about three weeks in a hotel and Irene continued her professional activities.

Neither in Reno nor Flagstaff were any of her engagements obtained by defendant. It should be pointed out, however, that there is no evidence that he was afflicted with the habit of working for a living.

After three weeks at Flagstaff, they proceeded to Chicago, where they resid-

ed in a hotel for almost one month. During this period Irene worked as a restaurant waitress for about two weeks and defendant earned $7 for about one day's work. After they had saved about $40 or $50, they decided they had enough money for the next leg of the journey, which would bring them to her sister's. home in Coshocton, Ohio, where they planned to reside for a short period, before going on to Maryland.[1] However, if the Coshocton relatives were expecting them, they were doomed to disappointment because of automobile troubles which beset Irene and defendant as they drove across the state of Indiana. He bought a rebuilt voltage regulator and battery cable at a junk yard and installed them. The trip eastward was resumed and they had dinner at Fortmeyer's, a truck stop near Fort Wayne. Then they found that the automobile would not start. Their funds had become depleted so that they had less than $6. They had the car towed a half mile down the road to a junk yard while they were in the car. After some delay defendant found that a new battery was required. The need for money was apparent. Irene, who had an unusual ability to improvise as occasion required, started to walk back to Fortmeyer's where she could earn some money, and a truck driver picked her up. Upon arriving at Fortmeyer's she performed one act of prosstitution and received $5. Defendant was then asleep in the car a half mile away. He had not urged her to go to Fortmeyer's to obtain the money; he said it was up to her.

Irene was arrested in Fortmeyer's by an Indiana state policeman and an agent of the FBI, while defendant was apprehended near his car at the junk yard.

■ 1. At the outset, we must consider the government's contention that, in the absence of manifest error, the question of sufficiency of evidence to sustain a conviction cannot be reviewed on appeal where no motion for judgment of acquit-

tal was interposed at the close of all the evidence.

The government in support of this contention cites a number of cases involving judgments based upon verdicts of juries. Corbin v. United States, 253 F.2d 646, 10 Cir.; Picciurro v. United States, 250 F.2d 585, 8 Cir.; Johns v. United States, 227 F.2d 374, 10 Cir.; Armstrong v. United States, 65 F.2d 853, 10 Cir. It also cites 18 U.S.C.A. rule 29, which is directed to jury trials.

The case at bar was tried by the court, without a jury, and the government's contention is not applicable to such a situation. Although not cited by the briefs in this case, we find that this precise question has been decided in Hall v. United States, 286 F.2d 676, 5 Cir. (1960), cert. denied 366 U.S. 910, 81 S. Ct. 1087, 6 L.Ed.2d 236. In that case, the court said, at 677 of 286 F.2d:

> "Further, Rule 29(a) is now so worded as to require the court 'of its own motion' to order the entry of a judgment of acquittal if the evidence is insufficient to sustain a conviction.
>
> "In any event, there can be little or no need for a formal motion for a judgment of acquittal in a criminal case tried to a court without a jury upon the defendant's plea of not guilty. The plea of not guilty asks the court for a judgment of acquittal, and a motion to the same end is not necessary. De Luna v. United States, 5 Cir., 1955, 228 F.2d 114, 116. In such a case, therefore, we hold that the sufficiency of the evidence to sustain a conviction should be reviewed the same as if there had been a formal motion for judgment of acquittal."

■ 2. The purpose of the planned journey from Reno, Nevada, to Laurel, Maryland, according to the uncontradicted testimony of Irene, a government witness, was other than prostitution. She was going to Laurel, Maryland, to visit her mother and child. In a prosecution

---

1. Both Irene and defendant testified that at the time of leaving Chicago it was the intention of both of them that she would not then engage in prostitution.

for violation of the Mann Act, the primary issue is whether there is any evidence that the woman was transported on a journey for an immoral purpose. The statute thus penalizes only those who use interstate commerce with a view toward accomplishing the unlawful purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose to induce, entice, or compel such a woman or girl to become a prostitute or give herself up to debauchery, or to engage in any other immoral practice. Mortensen v. United States, 322 U.S. 369, 373, at 374, 64 S.Ct. 1037, at 1040, 88 L.Ed. 1331. In that case, the court said:

"* * * To constitute a violation of the Act, it is essential that the interstate transportation have for its object or be the means of effecting or facilitating the proscribed activities. Hansen v. Haff, 291 U.S. 559, 563 [54 S.Ct. 494, 78 L.Ed. 968]. *An intention that the women or girls shall engage in the conduct outlawed by § 2 must be found to exist* before the conclusion of the interstate journey and *must be the dominant motive of such interstate movement*. And the transportation must be designed to bring about such result. Without that necessary intention and motivation, *immoral conduct during* or following *the journey is insufficient* to subject the transporter to the penalties of the Act." (Italics supplied.)

While we, by anything that we say herein, have no intention of condoning the immoral conduct of defendant and his woman companion, a dispassionate weighing of the government's evidence leads to the conclusion that the dominant motive of their interstate movement was not an intention that the woman should be transported in interstate commerce for the purpose of prostitution. It appears rather clearly, on the contrary, that, while these two persons were engaging in a trip in interstate commerce for a proper purpose, she did incidentally engage in prostitution. The latter was not the dominant motive of the trip. It was an incident which arose because of automobile difficulties which unexpectedly taxed their financial resources.

For these reasons, we feel required to reverse the judgment of the district court and it is so ordered.

We express to Charles L. LeMaster, Esq., of the Indiana bar, our appreciation for his able and gratuitous service for appellant in this case.

Judgment reversed.

SWYGERT, Circuit Judge (dissenting).

In a signed statement defendant admitted that he met Irene Britton in July, 1961 in Reno just after her arrival from Maryland; that she had no money and he bought her food and invited her to stay with him in a Reno hotel; that she said she could make money by working as a prostitute; that he "agreed to this and told her to go ahead;" that she started prostituting in Reno and gave her earnings to him; that they talked of leaving Reno and going to Maryland in early September; and that they had about $30 when they left Reno in a 1951 Chrysler. His statement continued:

"We traveled to Flagstaff, Arizona, where we had car trouble. We stayed in Flagstaff a week during which time Irene worked as a prostitute on three or four occasions. She obtained her own prostitution dates and gave me the money. She earned about fifty or sixty dollars as a prostitute in Flagstaff.

"After leaving Flagstaff we traveled east. I recall Irene worked as a prostitute in some places, in New Mexico on one occasion for which she was paid about $15.00. This money was used for gas and food. I recall Irene had a prostitution date east of Oklahoma for which she was paid about five or ten dollars. I can not recall the place but I know Irene worked as a prostitute in other states while we were traveling east.

She usually obtained her dates at truck stops along Route 66 as we traveled east. The money she earned we used for food and automobile expenses.

"We arrived in Chicago about the first week in October, 1961, and stayed at the New Atlas Hotel until October 25, 1961. We drove from Chicago, Illinois, to Fort Wayne, Indiana, where we had car trouble. We were without much money and while I was attempting to repair the car Irene went to Fortmeyer's truck stop to try to find prostitution dates. She told me when she left to go to Fortmeyer's she was going to make some money by prostitution.

\* \* \* \* \* \*

"When Irene and I left Reno, Nevada, we knew she would have to make money by prostitution in order to get us to Maryland."

Irene Britton testified that she engaged in prostitution while she and the defendant were in Chicago and that they used her earnings for "a room and for stuff to eat and we were saving some \* \* \* for our trip to where my sister was \* \* \* in Coshocton, Ohio." She further testified that when the car broke down near Fort Wayne, it was towed a short distance from Fortmeyer's truck stop to the Arrow Motor Parts Company; that afterwards she asked defendant "if I could go down to the truck stop and try to make some money. \* \* He said it was up to me."

In regard to the final episode of the trip, a F.B.I. agent testified that he asked defendant after his arrest if he knew if Miss Britton was at the Fortmeyer truck stop attempting to get prostitution dates and that the defendant said yes, he knew that she was there. The agent further testified as follows: " \* \* I asked him if he knew how often that they had to stop and obtain money and he said whenever they ran out of money wherever they were they would stop and she would go down and get prostitution dates so they could go on their way, so they would have money to eat with and

buy gas. \* \* \* He said they had come from Reno, Nevada, and were enroute to Laurel, Maryland, to get married as they had planned."

The defendant admitted that he had been married in October, 1960 in Chicago and that he had separated from his wife in July, 1961. He further testified that he had not communicated with his wife until he returned to Chicago in October, 1961 when she told him that she had begun to take legal steps to get a divorce. He further admitted that when he had talked by telephone to Irene Britton's family from Flagstaff and told them that he was bringing her home and was going to marry her, he was not sure whether he was married or not.

The trial judge, in stating his reasons for the finding of guilt, said in part:

"The Defendant bases his defense upon what we might call a change of heart, or a change of mind, that the parties agreed upon and he in particular during the stop in Chicago, but the Defendant admits that during that stop in Chicago that the woman was engaging there in acts of prostitution and those funds were used to feed him and to pay the hotel rent for the two of them there, and again they started out with a little savings.

\* \* \* \* \* \*

"They had already learned that unexpected auto trouble brings on unexpected expenses and must have been aware of the fact that other money might be needed along the way to augment their funds to continue the trip.

"It is also admitted that at the end of the first day on this trip, when they stopped in Allen County, Indiana, they were back at the same old stand, the same place that they had been engaging in admittedly across the west and insofar as the trip took them, to Chicago.

"In finding the Defendant guilty, as the Court is about to do, the Court must find that the Defendant has de-

liberately lied to this Court, \* \* \* We think that he entered the State of Indiana and came into this stop in Allen County with the same \* \* \* unlawful intent that he lived with every day from Reno to Flagstaff, and across the way to Chicago, \* \* \*."

It is the exclusive function of the trial court to weigh the evidence and evaluate the credibility of the witnesses. The finding of guilt must be sustained if there is substantial evidence taking the view most favorable to the government to support it.

I think the evidence is substantial for the trial court to find, as it did, that the act of prostitution at . Fortmeyer truck stop was an integral, albeit fortuitous, part of a plan adopted by Irene Britton and defendant to finance their trip from Nevada to Maryland, and that it was not an incidental occurrence after a "change of heart" by the parties after reaching Chicago that Irene Britton would no longer engage in prostitution.

As to whether the dominant purpose for the trip was for Irene Britton to engage in prostitution or debauchery or for any other immoral purpose, the question involves defendant's purpose for the transportation of Irene Britton and not her purpose in making the trip. While it is true that the purpose of Irene Britton for the trip may have been to return to her home in Maryland, I think there is substantial evidence to warrant a finding that the dominant purpose of defendant was to transport this woman across country so that he could continue to live with her in concubinage[1] and at the same time be supported by her earnings as a prostitute during the trip and have her finance the car expenses by such means.

This finding, warranted by the evidence, to the effect that defendant's purpose was to have Irene Britton engage in prostitution wherever and whenever it became necessary to provide their living and traveling expenses as he transported her interstate brings defendant, in my opinion, within the proscription of the statute. I would affirm.

---

[1]. The Supreme Court in Cleveland v. United States, 329 U.S. 14, 17, 18, 67 S. Ct. 13, 91 L.Ed. 12, held that [18 U.S.C. § 2421] "while primarily aimed at the use of interstate commerce for the purposes of commercialized sex, is not restricted to that end" and stated that the Court was adhering to the holding in Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442, that the transportation of a woman in interstate commerce so that she could become a mistress or concubine is a transportation for an "immoral purpose" within the meaning of the statute.