UNITED STATES of America,
Plaintiff–Appellee,

v.

Jairo SOTO–RODRIGUEZ, also known as "Jimmy", and Gustavo Calle, Defendants–Appellants.

Nos. 90–3580, 90–3581.

United States Court of Appeals, Seventh Circuit.

Argued June 11, 1993.

Decided Oct. 7, 1993.

Zaldwaynaka L. Scott, Asst. U.S. Atty., Office of the U.S. Atty. Criminal Div., Haywood McDuffie (argued), Barry R. Elden, Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

John Thomas Moran, Jr., Chicago, IL, argued for defendant-appellant.

Before EASTERBROOK and MANION, Circuit Judges, and ALDISERT, Senior Circuit Judge.*

* Hon. Ruggero J. Aldisert, Senior Circuit Judge of the United States Court of Appeals, Third Circuit, is sitting by designation.

MANION, Circuit Judge.

Mario Lloyd ran a highly successful cocaine distribution business in Chicago. Jairo Soto–Rodriguez and Gustavo Calle were two loyal and well-paid business associates. The government indicted Lloyd, Soto–Rodriguez, Calle and seven other members of the cocaine distribution ring for conspiring to violate and for violating federal drug and money-laundering statutes. Soto–Rodriguez and Calle were tried separately and convicted. They appeal, challenging the sufficiency of the evidence. They also claim that, if anything, the evidence indicated separate conspiracies rather than one large conspiracy. We affirm.

## I. Facts

Like any efficiently managed business, the Lloyd cocaine distribution ring delegated responsibility according to ability. Troy Shelton and Gregory "Sam" Hawkins made drug deliveries. They testified against Soto–Rodriguez and Calle at trial. According to their testimony, Soto–Rodriguez and Calle supplied cocaine and were personally involved in the details of its delivery. Following is a summary of the evidence concerning Soto–Rodriguez and Calle which was adduced at trial.

In September of 1987, Hawkins observed Lloyd and Soto–Rodriguez personally conduct a drug transaction in Lloyd's apartment; they gave ten kilograms of cocaine to a man "Easy" in exchange for $250,000. In March of 1988, Shelton acted as a middleman in a drug transaction between Soto–Rodriguez, Lloyd, and "Easy." Soto–Rodriguez left ten to fifteen kilograms of cocaine in a duffle bag at Lloyd's apartment. Later, Easy came to the apartment, picked up the cocaine, and left a bag full of money. Shelton delivered the money to Soto–Rodriguez, who was waiting in an apartment near Fullerton Avenue in Chicago—near the "El" train tracks and across from a hot dog stand. Soto–Rodriguez counted the money, took his share, and gave the rest to Lloyd.

A week after that transaction, the Lloyd organization provided Shelton and Hawkins with a new tool to conduct their trade: a red 1985 Nissan Maxima with a secret compartment behind the back seat for storing cocaine. The car had a New York registration in the name of "Gustavo Calle." Initially, Shelton and Hawkins would pick up the car from a drug supplier named Alvaro "Ibro" Cano, and would deliver cocaine which was hidden in the secret compartment to Lloyd's customers. They would then bring the money from the day's sales to Lloyd. On one occasion—in April 1988—they used this car to deliver cocaine to a person named "Vaughnee," and then took the proceeds of that sale to Soto–Rodriguez at his apartment near Fullerton.

During the summer of 1988, Shelton and Hawkins twice received cocaine from Soto–Rodriguez at Grant Park in Chicago. In July they met Soto–Rodriguez in the park. He made a telephone call and told them to wait. Soto–Rodriguez's brother then took the Nissan Maxima Shelton and Hawkins were driving and returned with ten kilograms of cocaine in the trunk. Shelton and Hawkins made an identical transaction a few weeks later. They met Soto–Rodriguez in Grant Park, he made a telephone call, and his brother took their car and returned with ten kilograms of cocaine.

To support Shelton and Hawkins' testimony about Soto–Rodriguez, the government presented the owner of the Fullerton apartment. He confirmed that he had rented the apartment—which was near the "El" train tracks and across from a hot dog stand—to Soto–Rodriguez during the relevant time period. The government also presented the testimony of a DEA agent who had examined Lloyd's telephone records. He indicated that fifty calls were made from Lloyd's telephone number to Soto–Rodriguez's telephone and pager numbers between September 19, 1988 and February 9, 1989. The records also showed that six telephone calls were made from Lloyd's car telephone to Soto–Rodriguez's telephone numbers.

In August 1988, a major drug supplier to the Lloyd ring quit supplying cocaine when Lloyd demanded a volume price discount.

Ibro Cano then put Lloyd in contact with his "cousin" Gustavo Calle, who could supply large quantities of drugs from New York. Calle was known to Lloyd as the person who held the title to the red Nissan Maxima. Calle had told Cano that he wanted to meet the man who was moving so much product in Chicago. Apparently, Calle became the supplier the Lloyd ring needed to satisfy customer demand. Calle began to travel to Chicago once or twice per week in a Volkswagen Jetta with large quantities of cocaine hidden in a secret compartment underneath the spare tire. He supplied 50–65 kilograms per trip, and charged $15,500 per kilogram. He would deliver the Volkswagen Jetta to Shelton and Hawkins, who would then deliver the drugs to Lloyd's customers. On November 1, 1988, Calle transported 60 kilograms of cocaine to Chicago for distribution by Hawkins and Shelton.

All went well between Lloyd and Calle until December 1, 1988. On that day, the FBI arrested Shelton as he drove the Nissan Maxima to complete a drug transaction. The FBI confiscated the car and its contents: $274,000 in cash and 24 kilograms of cocaine. The cash and cocaine belonged to Calle. Lloyd agreed to repay Calle for the lost cocaine and money but then got second thoughts. He blamed Calle for the bungled sale, attributing it to Calle's refusal to supply an additional car. Lloyd and Calle took their dispute to an individual named Rubin and two other Colombians—a form of binding arbitration in the drug business. Rubin advised Lloyd that he owed Calle $640,000. Lloyd borrowed $100,000 from Hawkins to begin payment on his debt. He also stepped up deliveries. He introduced Calle to some of his customers, who agreed to increase the price they charged to users, and to give Calle the overage. By the time he was arrested, Lloyd had paid $400,000 toward his debt.

To support Shelton and Hawkins' testimony about Calle, the government presented telephone records indicating that between September 10, 1988 and February 9, 1989, fifty-eight telephone calls were made from Lloyd's number to Calle's telephone and beeper. The government also presented testimony regarding the Volkswagen Jetta and

the Nissan Maxima. Records concerning the Nissan Maxima revealed that Calle originally purchased the car; his driver's license and social security numbers appeared on the bill of sale. Later, at Lloyd's suggestion, the car was retitled in the name of "Dodd Blandon" to avoid suspicion if Shelton—a non-Hispanic—was stopped by the police. The government also produced Calle's address book, which included the names and corresponding telephone numbers for several members and customers of the Lloyd organization.[1]

The grand jury indicted Lloyd, Calle, Soto–Rodriguez and seven other members of the Lloyd gang on August 15, 1989. The case against Soto–Rodriguez and Calle proceeded separately from the other defendants. After the presentation of evidence, they asked the court to provide the jury with a multiple conspiracy instruction; the court refused. The jury returned a verdict against both defendants on Count I, which charged conspiracy with intent to distribute at least 1500 kilograms of cocaine in violation of 21 U.S.C. § 846. The jury also returned a verdict against Calle on Count VII, which charged possession with intent to distribute approximately 60 kilograms of a mixture containing cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. However, the jury could not reach a verdict on the only other count concerning Soto–Rodriguez or Calle—Count III, which charged Soto–Rodriguez with possession with intent to distribute approximately 15 kilograms of a mixture containing cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Soto–Rodriguez and Calle appeal, contending: 1) that the evidence was insufficient to convict on Counts I and VII; 2) that a variance existed between the indictment and the evidence; and 3) that the district court erred in refusing to give a multiple conspiracy instruction.

## II. Analysis

■ When a defendant appeals his conviction by challenging the sufficiency of the evidence, we consider all the evidence and all reasonable inferences that can be drawn from the evidence in the light most favorable to the government. *United States v. Jackson*, 935 F.2d 832, 840 (7th Cir.1991). We will affirm if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Penson*, 896 F.2d 1087, 1093 (7th Cir.1990). A conspiracy is a "combination or confederation between two or more people formed for the purpose of committing, by their joint efforts, a criminal act." *United States v. Mayo*, 721 F.2d 1084, 1088 (7th Cir.1983). In this case a jury decided that Soto–Rodriguez and Calle combined with the other members of the Lloyd gang to distribute drugs in Chicago. The jury also decided that Calle once possessed with the intent to distribute 60 kilograms of a mixture containing cocaine. The evidence supports both verdicts.

■ Hawkins and Shelton—themselves members of the conspiracy—testified that Soto–Rodriguez and Calle supplied cocaine through the Lloyd ring and received payment for their products. According to the testimony, neither Soto–Rodriguez nor Calle was an isolated supplier. Both had their hands in the actual chain of distribution. Soto–Rodriguez made at least one personal delivery to a man named Easy, and split his payment for that deal with Lloyd. Otherwise, Soto–Rodriguez used Hawkins and Shelton as couriers. Calle entered the conspiracy upon expressing his desire to meet the man who was moving so much product in Chicago. Not only did Calle meet Lloyd, he began to supply him with large quantities of cocaine; on one occasion—November 28, 1988—Calle brought 60 kilograms of cocaine to Chicago. Calle also provided two cars with secret compartments to facilitate delivery of the drugs. Like Soto–Rodriguez, Calle accomplished his deliveries through Shelton and Hawkins. An abundance of documentary evidence also links Soto–Rodriguez and Calle to the Lloyd ring: telephone rec-

---

1. The telephone numbers were in code, and each digit in the telephone number had to be subtracted from ten to determine the actual number. Once that simple calculation was made, howev-er, the numbers in Calle's book corresponded to the actual telephone numbers of the persons listed.

ords, automobile records, and Calle's telephone book.

Soto–Rodriguez and Calle argue that they could not have been members of the same conspiracy because there was no evidence that they ever met. However, "[t]he parties involved in a conspiracy do not have to know the other conspirators or participate in every aspect of the conspiracy." *United States v. Sababu*, 891 F.2d 1308, 1322 (7th Cir.1989). Indeed, two workers on opposite ends of an assembly line may never meet, but both conspire to build the finished product. "The key question is ... whether the conspirators are performing different functions in pursuit of common criminal objectives." *Id.* Although there is no evidence that Soto–Rodriguez and Calle met, there was sufficient evidence by which a jury could find that they both worked in different capacities within the Lloyd ring to accomplish the criminal objective of distributing cocaine. They used the same couriers—Shelton and Hawkins—and sometimes the same cars to accomplish their business. They also both used the direction and leadership of the ringleader, Mario Lloyd. *See United States v. Sophie*, 900 F.2d 1064, 1081 (7th Cir.1990) ("The fact that old suppliers left the conspiracy and new suppliers entered does not mean that those suppliers cannot be found guilty for participating in that conspiracy.").

Along the same line, the defendants argue that the evidence at most indicates two separate conspiracies: one between Lloyd and Soto–Rodriguez and the other between Lloyd and Calle. They argue that the existence of separate conspiracies rather than one large one creates a variance between the indictment, which charged one large conspiracy, and the evidence. "Separate conspiracies exist when each of the conspirators' agreements has its own end, and each constitutes an end in itself." *Sababu*, 891 F.2d at 1322. Ultimately, "[w]hether a single conspiracy exists is a question of fact." *Sophie*, 900 F.2d at 1080. We will affirm the jury's finding of a single conspiracy if sufficient evidence supports that finding: "[E]ven if the evidence arguably establishes multiple conspiracies, there [is] no material variance from an indictment charging a single conspir-

acy if a reasonable trier of fact could have found beyond a reasonable doubt the existence of a single conspiracy charged in the indictment." *United States v. Maholias*, 985 F.2d 869, 874–75 (7th Cir.1993). We have already held that the evidence presented supported the single conspiracy charged in the indictment. Therefore, there is no variance between the indictment and the proof. *See Sophie*, 900 F.2d at 1081. ("[I]t is proper to view ... an ongoing drug distribution conspiracy involving core members who buy and sell to various suppliers and dealers who may change over time—as a single conspiracy rather than a series of smaller conspiracies.")

■ Finally, the defendants assert that the district court erred by failing to give a multiple conspiracy instruction. Instead, the court gave the Seventh Circuit's pattern instruction on conspiracy:

A conspiracy is a combination of two or more persons to accomplish an unlawful purpose. A conspiracy may be established even if its purpose was not accomplished. In determining whether the alleged conspiracy existed, you may consider the acts and statements of all the alleged participants. The agreement may be inferred from all of the circumstances and the conduct of all the alleged participants.

To be a member of a conspiracy a defendant need not join at the beginning or know all the names or the means by which the purpose was to be accomplished. In determining whether the defendant became a member of the conspiracy you may consider his acts and statements, and you may also consider the acts and statements of the other alleged conspirators made during the course of the conspiracy bearing on the question of a defendant's membership in the alleged conspiracy.

The government must prove beyond a reasonable doubt from the defendant's own acts and statements that he joined the conspiracy; in other words, that he was aware of the common purpose and was a willing participant.

The defendants contend that by giving this instruction instead of the one they proposed,

the district court violated their Fifth Amendment right to present a theory of defense.

■ A defendant is entitled to an instruction on his theory of defense only if: 1) the defendant proposes a correct statement of the law; 2) the defendant's theory is supported by the evidence; 3) the defendant's theory of defense is not a part of the charge; and 4) the failure to include an instruction on the defendant's theory of defense in the jury charge would deny the defendant a fair trial. *United States v. Douglas,* 818 F.2d 1317, 1320–21 (7th Cir.1987). We need not consider whether the defendants proposed a correct statement of law or if their theory was supported by the evidence. We have recently concluded that instructions similar to the one given by the court sufficiently "inform the jury that, in order to convict a defendant of an alleged conspiracy, it must find that he was a member of that conspiracy and not another." *United States v. Auerbach,* 913 F.2d 407, 417 (7th Cir.1990). *See also United States v. Briscoe,* 896 F.2d 1476, 1513–14 (7th Cir.1990). Therefore, Soto–Rodriguez and Calle failed the third and fourth prongs of the *Douglas* test. Their proposed instruction only reiterated that the defendant must be found guilty of the charged conspiracy rather than another. The failure to give the instruction did not prejudice the defense. *See also United States v. Durades,* 929 F.2d 1160, 1167 (7th Cir.1991) ("The district court has some latitude in its wording of the instruction and may reject proposed instructions if the essential points are covered by those instructions given.").

### III. Conclusion

For the foregoing reasons, we

AFFIRM.