**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Samuel H. SOUTH, Defendant–Appellant.**

No. 93–1796.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 11, 1994.

Decided June 29, 1994.

Madeleine S. Murphy, Asst. State's Atty. (argued), Office of the U.S. Atty., Criminal Div., Barry R. Elden, Asst. U.S. Atty., Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Charles J. Durham, Edward R. Vrdolyak, Ltd., Chicago, IL (argued), for defendant-appellant.

Before CUMMINGS, CUDAHY and MANION, Circuit Judges.

MANION, Circuit Judge.

Samuel South ("South") and Rubin Lopez–Ortiz a/k/a "Sanchez" ("Sanchez"), were charged in a two-count indictment with conspiring, between themselves as well as with others known and unknown to the grand jury, to possess with intent to distribute approximately 156 kilograms of cocaine, and attempt to possess with intent to distribute the same amount of cocaine, all in violation of 21 U.S.C. §§ 841(a)(1) and 846. After a two-

day bench trial, South was found guilty on both counts. Following the district court's verdict, South, pursuant to Fed.R.Crim.P. 33, filed a combined motion for new trial or, in the alternative, for judgment of acquittal, which the district court denied. The district court sentenced South to concurrent terms of 188 months imprisonment on both counts, to be followed by five years supervised release. In his direct appeal, South raises four arguments, including a challenge to the sufficiency of the evidence in support of his convictions for conspiracy and attempt, and a challenge to the effectiveness of trial counsel. For the following reasons, we reject South's contentions and affirm the judgment of the district court.

## I.

*A. Background*

On August 17, 1988, customs officials became suspicious of three wooden crates stored in the Pan Am Freight Terminal at O'Hare International Airport. The crates were very large and showed no country of export. Finding this unusual, the customs officials checked the airway shipping bill. The airbill stated that the shipment had come from Panama and, further, that no value had been declared, even though the cost of shipping the crates came to $4,934.00.

The consignee listed for the shipment was Chicago Industrial Import and Export ("Chicago Industrial"). Customs officials ran a computer check on Chicago Industrial and found that it had not previously imported into the United States through United States Customs. Customs officials called directory assistance to obtain a telephone number for Chicago Industrial, and found that none existed. The airbill listed a telephone number for Chicago Industrial which matched that of a public phone located at Pass, Inc., a car wash owned and operated by South. Further investigation revealed that the address listed for Chicago Industrial closely matched the address of Pass.

Customs officials next opened up one of the three crates. Inside, they found packages containing lava stone grinding wheels in several different sizes. One of the officials testified that an odor resembling glue and/or vinegar emanated from the crate. The officials next broke open one of the grinding wheels and found inside a white substance in a plastic package wrapped in aluminum foil. Field tests demonstrated that the white powder was cocaine.

Customs officials contacted Agent Joseph Alkus, Special Agent of the Organized Crime Drug Enforcement Task Force, to inform him of their discovery. Agent Alkus, along with Agent Tucci of the DEA, went to the warehouse to examine the shipment. When they arrived, the customs officials were in the process of examining the grinding wheels contained in the crates. Agents Alkus and Tucci observed the customs officials drill through the grinding wheels. If white powder was discovered in a grinding wheel, it was broken open. As it turned out, all of the twelve-inch grinding wheels contained packages containing cocaine. The parties stipulated at trial that the amount of cocaine contained in the grinding wheels was 156 kilograms.

Later that same day, the DEA arranged for a controlled delivery of the three crates. In preparation, the DEA agents installed a beacon device which would alert the agents when the crates were opened. The next day, August 19, 1988, the three crates were dropped off at Pass and taken inside for storage. DEA agents maintained surveillance of the building until August 20, 1988.

After nobody came to pick up the crates, DEA agents went inside Pass to have a talk with South. The agents told South they wanted some information about the shipment that had been received the previous day. South told the agents that the shipment was received on behalf of Mr. William King, the owner of Chicago Industrial. According to South, King leased one of the offices at South's car wash. South told the agents that King had called the day before to arrange delivery of the shipment. South told the agents that pursuant to an arrangement with King, South had paid for the shipment and was storing it for King. South said that he had been unsuccessful in his attempts to contact King.

At this point the agents told South that the shipment contained cocaine and requested that agents be permitted to stay on the premises and conduct surveillance. South agreed to the agents' request. Next, the agents, pursuant to a warrant, conducted a search of South's car wash. During the search, South directed the agents to the office purportedly leased by King. During the search of King's office, South provided the agents with a lease agreement between him and King which ran from June 1, 1988 to June, 1989, and which was purportedly signed by King. While searching King's office, agents discovered a letter from Burlington Northern Railroad, addressed to a Mr. Lopez in Houston, Texas, with a copy sent to Mr. W. King, Jr. at Pass, Inc., indicating that a previous shipment had been sent to Chicago Industrial. Agents also discovered carbon copies from two cashier's checks, one for Robinson Enterprises in the amount of $620.00, and the other for the United States Customs, in the amount of $429.27. After the search, Agent Alkus wrote down his name, telephone and beeper number on the back of one South's business cards. Agent Alkus told South to contact him should King happen to call.

King never came by. In the meantime, the agents met with South to obtain more information about King. South told the agents that he had met King at the race track. At the time they met, South was behind in his rent at the car wash. South proposed that King sublease some office space at the car wash. Shortly after King started leasing the office space, he informed South that he was expecting a shipment on or about August 22, 1988, and that South should contact a man named Sanchez in order to obtain some cashier's checks for the brokerage and customs fees for the shipment. During this interview, South provided the agents with an address for King. A team of agents later went to this address. No Mr. King lived there. Following another meeting with South a couple of days later, Agent Tucci attempted a background check on King with the Chicago Police, the DEA and local utility records, but was unable to locate anyone by that name. Realizing that there probably was no such person, the DEA called off the surveillance and took the crates into custody on September 2, 1988.

Meanwhile, on September 24, 1988, a Lebanese national named Michael Zagheib was arrested in Houston following an attempted delivery of 83 kilograms of cocaine to an undercover DEA agent. At the time of his arrest, Zagheib had in his possession one of South's business cards—the very same card which had written on it the name, telephone and beeper numbers of Agent Alkus. Zagheib also had in his possession a receipt from a Chicago hotel bearing the name Roger Saenz (who, as it turns out, is Sanchez). Zagheib subsequently pleaded guilty to the attempted cocaine delivery and agreed to cooperate with the government in its investigations of cocaine trafficking. He further agreed to testify for the government in any criminal proceedings that resulted from such investigations. The following facts are based on Zagheib's testimony.

In 1987 Zagheib moved to Colombia. Shortly after his arrival, Zagheib became involved in the drug business of Michele Khoury, another Lebanese national who was also living in Colombia. In September of 1988, Zagheib, on behalf of Khoury, flew from Colombia to Houston, to arrange a drug transaction unrelated to the one at issue in this case. Khoury also directed Zagheib, during this trip, to check on a shipment of cocaine that had been packaged in wheel grinding stones and shipped to Chicago. Khoury asked Zagheib to contact Khoury's broker for the Chicago shipment, Roger Saenz, and make arrangements with him to ship the cocaine from Chicago to Beirut, Lebanon.

When in Houston, Zagheib telephoned Saenz, who subsequently flew down to Houston to discuss the shipment of cocaine. Zagheib testified that during their meeting, Saenz told Zagheib that the cocaine was packaged in three large crates which were being stored in a warehouse owned by a person named "Sam." Zagheib asked Saenz if this "Sam" could be trusted, to which Saenz said that he knew him well, trusted him and had done business with him in the past.

Following this meeting, Saenz flew back to Chicago to make arrangements for shipping the cocaine to Beirut. By this time, however, the DEA had already removed the cocaine from Pass. Not finding the cocaine at Pass, Saenz flew back to Houston (where Zagheib was staying) and informed Zagheib that the shipment was gone. Saenz told Zagheib that he suspected "Sam" was involved in the disappearance. At Khoury's directions, Zagheib flew back to Chicago with Saenz to determine what had happened to the missing cocaine. In Chicago, Zagheib and Saenz checked into a motel room registered in Saenz's name. The motel receipt from this stay bore Saenz's name and address and was the same later found on Zagheib's person.

The next day Saenz paged "Sam" on his beeper and set up a meeting between Sam, Saenz and Zagheib to discuss the missing cocaine. Saenz and Zagheib drove to a prearranged location where they were joined by a person driving a white Mercedes. At trial, Zagheib identified South as the driver of the white Mercedes. Zagheib testified that Saenz demanded to know what had happened to the shipment of cocaine. South responded that the police had confiscated the cocaine. As proof, South gave Saenz the business card on which Agent Alkus had written his name and numbers. South told Saenz that if he wanted to locate the shipment that he should contact the person whose name was written on the card. Saenz gave this card to Zagheib and together they drove back to the airport. On the way to the airport, Saenz stopped at a gas station and placed a telephone call. Zagheib testified that Saenz told the party on the phone that he didn't believe that the government had confiscated the cocaine and thought that South was trying to trick them. Zagheib flew back to Houston, while Saenz stayed behind in Chicago. This was the last time Zagheib saw Saenz, who remains a fugitive to this day.

Agent Tucci gave the following testimony. Over the course of the fall of 1988 through 1989, Agent Tucci had numerous discussions with South about the elusive Mr. King. Finally, on May 1, 1990, Agent Tucci and Agent Callahan met with South and his initial attorney, Jerry Lipschultz, in the DEA offices in Chicago. The agents told South it was time to come clean about King. At that time, South confessed that there was no King. Attorney Lipschultz informed the agents that he wanted some time to speak with his client. The agents complied and left the two alone in the office. When they returned, Lipschultz stated that South wanted to make a deal with the government. The agents said that they were not interested in any deals because South had stalled the investigation long enough. Lipschultz responded that South still wanted to cooperate. South again admitted, in Lipschultz's presence, that there was no King. He also admitted that he had made up the phony lease between himself and King. He told the agents that he met Mr. Lopez–Ortiz, whom South called "Sanchez," through the owner of a jewelry store where South had previously obtained small amounts of cocaine. South further stated that after the jewelry store closed, he made several direct purchases from Sanchez, in amounts ranging from a few ounces to several kilograms purchased on consignment. South and Sanchez became close associates, and, as their association grew, Sanchez came up with the idea of setting up a front import business, Chicago Industrial, at South's car wash. According to the plan, Sanchez, through Chicago Industrial, would have various shipments delivered at South's car wash. Some of these shipments would contain legitimate items; others would contain cocaine. South told the agents that after crates containing the grinding wheels had been confiscated by the DEA, Sanchez and another individual whom South had never met came to the car wash to discuss the missing shipment. South told the agents that during this meeting, he gave Sanchez the business card on which Agent Alkus had written his name and numbers, and told Sanchez that "[t]hese are the people that took your cocaine."

### B. Proceedings Below

On January 16, 1992, the grand jury returned a two-count indictment against South, charging him with conspiracy to possess with intent to distribute 156 kilograms of cocaine, and attempt to possess the same with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846. On July 9, 1992, South

entered a plea of not guilty to both counts. On September 1, 1992, South's original attorney, Mr. Lipschultz, was granted leave to withdraw from South's case. Attorney Charles Slaughter was substituted as South's trial counsel. South, through attorney Slaughter, waived his right to jury trial and proceeded to trial on November 19, 1992 before Judge Leinenweber.

At trial, customs officials and DEA agents testified concerning their involvement in the case, including the discovery of the crates and the cocaine, the controlled delivery and the various interviews with South. As noted above, the government presented Michael Zagheib who testified extensively concerning the source of the cocaine and his meetings with Sanchez. The government also presented the testimony of Cornell Robinson, South's stepson and the manager of Pass. Robinson testified that he had worked at Pass for over five years and yet at no time did he ever meet or know of a person by the name of King. On the other hand, Robinson testified that he saw Sanchez several times at South's car wash, particularly on the day that the shipment arrived.

In his defense, South took the stand and attempted to recant his admissions to the DEA agents. He testified that his previous admissions were the products of fear and coercion on the part of the DEA agents, and that he told them whatever they wanted to hear just so that they would leave him alone. In support of this theory, South also put on the testimony of his former attorney, Jerry Lipschultz. South attempted to elicit testimony from Lipschultz to the effect that South was not in his right mind when he made several damaging admissions to the DEA agents.

Following two days of testimony, the district court, on November 20, 1992, found South guilty on both counts of the indictment. In its oral ruling from the bench, the district court explained that the crucial fact in making its determination was South's admissions to the DEA agents. The district court noted that South had previously worked in a paralegal-type capacity for numerous lawyers, including Mr. Lipschultz, and was "a person very knowledgeable of the affairs of life." Given this, the district court rejected out-of-hand South's contentions that he would confess to being involved in a 156 kilogram cocaine transaction just because he was upset and having a bad day. The court further explained that if, as South testified, King came by the car wash two or three times a week, then it was inconceivable that Robinson, as manager of the car wash, had never met King. Based on this, the district court concluded that the only person with whom South was dealing was Sanchez and that together, they had arranged for South to participate in the importation of cocaine into the United States for the purposes of distribution.

■ On November 30, 1992, South, pursuant to Fed.R.Crim.P. 33,[1] filed a combined motion for a judgment of acquittal or new trial, arguing, among other things, that the government's evidence did not preclude the possibility that someone other than South rented and used office space at Pass, and that the government had failed to prove, for purposes of attempt, that South intended to possess the cocaine. In response, the government noted that because South never filed a motion for judgment of acquittal at the close of the evidence, his motion was waived. In ruling on South's motion, the district court pointed out that the government, through the testimony of Robinson, had more than sufficiently rebutted the existence of King. The district court further explained that this testimony, coupled with South's own admissions, and the testimony of Sanchez as offered through Zagheib, was more than ample to support the court's determination that South was guilty beyond a reasonable doubt on both counts. Accordingly, the district court denied South's motion.

## II.

In his direct appeal, South raises four arguments; only three merit discussion. South

---

1. Although a motion for judgment of acquittal is properly made under Fed.R.Crim.P. 29, this is of no importance for a "motion for acquittal and a motion for new trial can be, and often are, combined." 2 Charles A. Wright *Federal Rules of Criminal Procedure* § 465 at 652 (1982) (footnotes omitted).

first challenges Zagheib's testimony because it consisted of inadmissible coconspirator statements under Fed.R.Evid. 801(d)(2)(E). He also claims that the evidence at trial was insufficient to prove him guilty beyond a reasonable doubt. Finally, he argues that his trial counsel was constitutionally ineffective.

### A. Co-conspirator Hearsay

█ South first challenges the district court's admission of Zagheib's testimony. Underlying South's argument is an assumption that, for purposes of Rule 801(d)(2)(E), it is *Zagheib* who is the out-of-court declarant. We say this because in the relevant portion of his brief, as well as at oral argument, South's sole argument on this point was that there was nothing in the record which would permit the district court to find, pursuant to Rule 801(d)(2)(E), that Zagheib and South were coconspirators.[2] Because the evidence would not support such a finding, South argues that Zagheib's testimony was not that of a coconspirator, and therefore his testimony was inadmissible under Rule 801(d)(2)(E).

█ As the government correctly points out, South's counsel at no time objected to Zagheib's testimony on the basis that he was not a coconspirator. The following is the relevant portion of the government's direct examination of Zagheib:

Q. Did you ask Saenz anything about this person "Sam"?

A. I do ask him if he know him and how long he know him and how he can trust him.

Q. What was his response?

A. He say that he know him well and he trust him and he done business with him before.

MR. SLAUGHTER: Objection to this, Judge.

MR. RIVKIN: Judge, it is very prejudicial but, unfortunately, it's a statement of a co-conspirator.

THE COURT: All right. As a statement of a co-conspirator, I will overrule it.

BY MR. RIVKIN:

Q. Could you repeat your answer, sir?

A. Yes, sir. He say he know him very well and he done business with him before and he's a good man.

It is obvious that South's vague, unspecific objection, did not inform the court that South was objecting on the basis that Zagheib was the out-of-court declarant, and that he was not a co-conspirator. *See, e.g., United States v. Davis,* 15 F.3d 1393, 1406–07 (7th Cir.1994) (noting that "[a] timely and proper objection apprises the court of the precise nature of the alleged error so the court has an opportunity to rectify any shortcoming."). Indeed, from our review of the transcript, we think that both the government and the district court understood South's objection as being directed to the out-of-court statement of *Saenz* being offered through Zagheib's testimony. Thus, because the district court had no opportunity to address, much less correct, South's objections to Zagheib's testimony, South is presenting an argument on appeal that was not raised at trial, which means that this specific issue is waived for appellate review. *See Davis,* 15 F.3d at 1407. As a result, South can only challenge Zagheib's testimony if its admission constituted plain error under Fed.R.Crim.P. 52(b). *See Davis,*

---

**2.** South suggests in his brief that the district court erred by not entering express *"Santiago"* findings (named after this court's decision in *United States v. Santiago,* 582 F.2d 1128 (7th Cir.1978)) into the record as a prerequisite to admitting this testimony as coconspirator statements under Rule 801(d)(2)(E). To satisfy *Santiago,* before the government can introduce testimony under Rule 801(d)(2)(E), it must prove, by a preponderance of the evidence, that: (1) a conspiracy existed; (2) in which the out-of-court declarant and defendant were members; and (3) that the out-of-court statement was made in fur-

therance of the conspiracy. *See United States v. Maholias,* 985 F.2d 869, 878 (7th Cir.1993).

For starters, this argument is mooted by our determination, *infra,* that South's objections do not implicate Rule 801(d)(2)(E) at all. But even if they did, a district court does not have to enter express conspirator statement findings on the record before it can admit these statements into evidence. It is sufficient if these findings are supported by the trial record. *See United States v. Nicosia,* 638 F.2d 970, 974 (7th Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981).

15 F.3d at 1407; *accord United States v. Wynn*, 845 F.2d 1439, 1442 (7th Cir.1988).

█ After examining South's contentions, it is clear that there is no error, much less plain error, in this case. To be plain error under Rule 52(b) "presupposes the existence of an error," *Wynn*, 845 F.2d at 1442 n. 7, which means a " 'deviation from a legal rule.' " *Davis*, 15 F.3d at 1407 (quoting *United States v. Olano*, — U.S. —, —, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993)). We emphasize this because to the extent South is challenging the admission of *Zagheib*'s testimony, Rule 801(d)(2)(E) is not implicated at all. Rule 801(d)(2)(E) provides that an *out-of-court* statement offered against a party is not hearsay at all if it is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). Zagheib testified in court, so his statements are not those of an out-of-court declarant. It is clear then that the only out-of-court statements the government sought to be admitted through the above portions of Zagheib's testimony were those of Sanchez. Yet nowhere in his brief or at oral argument did South say anything about the out-of-court statements of Sanchez. Thus, in labeling Zagheib's testimony as that of the out-of-court declarant, South has focused on the wrong person for purposes of Rule 801(d)(2)(E). Therefore, South's challenges to Zagheib's in-court testimony do not allege a "deviation from a legal rule," *Davis*, 15 F.3d at 1407, and for that reason, South can point to no error at all within the meaning of Rule 52(b).

## B. *Sufficiency of the Evidence*

South next asserts that the evidence was insufficient to support his convictions for conspiracy and attempt. In reviewing the sufficiency of evidence on appeal, "we consider the evidence presented at trial in the light most favorable to the government; if we conclude that any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt, we will reject the defendant's sufficiency challenge." *Davis*, 15 F.3d at 1397 (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

█ At the outset, we must address the government's contention that since South failed to move for a judgment of acquittal at the close of all the evidence or within the seven-day period following the verdict as provided for in Fed.R.Crim.P. 29(c), then, absent a manifest miscarriage of justice, South has waived any challenge to the sufficiency of the evidence supporting his convictions. We have no quarrel with the government's statement of the general rule, for it is well-established in this circuit, stretching back nearly thirty years. *See, e.g., United States v. Pless*, 982 F.2d 1118, 1122 (7th Cir.1992); *United States v. Teague*, 956 F.2d 1427, 1433 (7th Cir.1992); *United States v. James*, 923 F.2d 1261 (7th Cir.1991); *United States v. Caudill*, 915 F.2d 294, 296 (7th Cir.1990); *United States v. Moya–Gomez*, 860 F.2d 706, 745–46 n. 33 (7th Cir.1988), *cert. denied*, 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989); *United States v. Berardi*, 675 F.2d 894, 902 n. 16 (7th Cir.1982); *United States v. Moorman*, 358 F.2d 31, 33–34 (7th Cir.1966), *cert. denied*, 385 U.S. 866, 87 S.Ct. 127, 17 L.Ed.2d 93 (1966); *United States v. Childress*, 347 F.2d 448, 451 (7th Cir.1965), *cert. denied*, 384 U.S. 1012, 86 S.Ct. 1936, 16 L.Ed.2d 1030 (1966).[3]

But what is puzzling is the government's invocation of the rule in this particular case. South filed a timely[4] post-trial motion in

---

**3.** We also point out that, according to the language of Fed.R.Crim.P. 29(c), it is no longer necessary for a defendant wishing to make a post-trial motion for judgment of acquittal to have previously made a similar motion following the close of all the evidence. *See* Fed.R.Crim.P. 29(c) ("[i]t shall not be necessary to the making of such a motion that a similar motion has been made prior to the submission of the case to the jury."); *see also United States v. Castro–Lara*, 970 F.2d 976, 980 (1st Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 2935, 124 L.Ed.2d 684

(1993) ("[e]ven absent *any* motion for judgment of acquittal at trial, a defendant who files a timeous post-trial motion for acquittal stands on the same footing as a defendant who moves for acquittal at the close of all the evidence; and the former is, therefore, entitled to the benefit of the same standard of appellate review as the latter.") (emphasis in original).

**4.** The district court handed down its verdict from the bench on November 20, 1992. Under Fed.R.Crim.P. 45(a) the seven-day time period did

which he challenged the sufficiency of the evidence supporting both convictions. The government maintains that "the sufficiency of the evidence was not one of the four issues raised in South's motion for a new trial." Appellee's Br. at 39. But it was. In paragraph two of his motion, South states that "[t]he circumstantial evidence presented at the trial did not exclude the reasonable theory that the people who rented and used the sapce [sic] at the car wash caused the drugs to be delivered without the defendant's knowledge." In paragraph four, South states that "the government's evidence failed to prove the defendant guilty beyond a reasonable doubt in that they failed to show the defendant intended to possess the contraband." Although these arguments were not the most sophisticated, they were enough to put the government on notice that South was contesting the sufficiency of the evidence in support of both convictions. Rule 29 does not require anything more. *See United States v. Gjurashaj*, 706 F.2d 395, 399 (2d Cir.1983) ("the very nature of such motions is to question the sufficiency of the evidence to support the conviction") (citing *United States v. Jones*, 174 F.2d 746, 748 (7th Cir.1949)); *see also* 2 Charles A. Wright *Federal Rules of Criminal Procedure* § 466 at 653 (1982) ("Specificity is not required by Rule 29 or by Rule 47. In this respect the Criminal Rules differ from the Civil Rules.") (footnotes omitted).

■ But there is a more fundamental reason why the government's invocation of the "raise or waive" rule is inapplicable in this case. Unlike the cases stating the general rule, *supra*, South's case was tried before the court, without a jury. In *United States v. Hon*, 306 F.2d 52 (7th Cir.1962) we stated that

> there can be little or no need for a formal motion for a judgment of acquittal in a criminal case tried to a court without a jury upon the defendant's plea of not guilty. The plea of not guilty asks the court for a judgment of acquittal, and a motion to the same end is not necessary.

*Id.* at 54 (quotations omitted) (citing *Hall v. United States*, 286 F.2d 676, 677 (5th Cir. 1960), *cert. denied*, 366 U.S. 910, 81 S.Ct. 1087, 6 L.Ed.2d 236 (1961)); *see also* 2 Wright, *supra* at § 469 (same). *Hon* is still the law of this circuit. In fact, the Ninth Circuit recently took note of and agreed with our decision in *Hon* when, following en banc reconsideration, it held that "no motion for acquittal is necessary in a bench trial in order to preserve for appeal a challenge to the sufficiency of the evidence." *United States v. Atkinson*, 990 F.2d 501, 503 (9th Cir.1993) (en banc). Thus, according to *Hon*, it was unnecessary for South to file a post-trial motion challenging the sufficiency of the evidence in order to preserve this challenge on appeal.

*1. The conspiracy charge.*

■ Section 846 of Title 21 "makes it a crime to conspire to violate § 841, which outlaws possession of cocaine with intent to distribute." *Maholias*, 985 F.2d at 874. "A conspiracy is a combination or confederation between two or more persons formed for the purpose of committing a criminal act through their joint efforts." *United States v. Durrive*, 902 F.2d 1221, 1225 (7th Cir.1990) (quotations omitted) (citations omitted). To prove South's membership in the conspiracy, the government must both show that South both knew of the conspiracy and that he intended to join it. *See United States v. Hubbard*, 22 F.3d 1410, 1414–15 (7th Cir. 1994). A conspiracy conviction, like any other crime, may be based entirely upon circumstantial evidence. *See United States v. Kozinski*, 16 F.3d 795, 807–08 (7th Cir.1994) (citing *United States v. Townsend*, 924 F.2d 1385, 1391 (7th Cir.1991)).

■ There is little doubt that the evidence presented at trial was more than adequate to sustain South's conspiracy conviction. Agent Tucci testified that South, in the presence of his first attorney, Jerry Lipschultz, admitted to Agents Tucci and Callahan in 1990 that there was no King. South told Agent Tucci that in fact it was he and Sanchez who had

---

not start to run until November 21, 1992. After excluding all intervening Saturdays and Sundays, *see id.*, the last day for filing the motion

was November 30, 1992, the day South filed his motion. Thus, the motion was timely.

agreed to set up Chicago Industrial as a front for importing cocaine. Thus, South knew that Sanchez was working with someone else to bring cocaine into the country, and arranged with Sanchez to have this cocaine delivered to his car wash. South told the agents that after the DEA had taken the cocaine shipment into custody, Sanchez and another individual confronted South about the missing shipment. South stated that he gave Sanchez the business card on which Agent Alkus had written his name and numbers and told Sanchez that this was the person who "took your cocaine."

In addition, portions of South's admissions were independently corroborated through Zagheib's testimony. Zagheib testified that he was directed by Khoury to get a shipment of cocaine out of Chicago and back to Beirut. Zagheib was told that the broker for this shipment and the person Zagheib was to contact was Sanchez. Zagheib testified that when he met Sanchez in Houston, Sanchez told him that the cocaine was being stored in a warehouse owned by "Sam." Obviously concerned that such a large shipment of cocaine was being stored in a building owned by an unknown, Zagheib asked Sanchez what he knew about "Sam," to which Sanchez responded that he had done business with him in the past. Zagheib also testified about going to Chicago with Sanchez to meet with Sam and find out what had happened to the missing shipment. Zagheib stated that he and Sanchez met with Sam, whom Zagheib identified as South. At that time, Zagheib testified, South handed Sanchez the card on which Agent Alkus' had written his name and numbers, stating that this was the person who "took your cocaine." When Zagheib was later arrested on an unrelated cocaine transaction, this same card was found on Zagheib's person, along with other written documents corroborating Zagheib's correspondences with Sanchez. Viewing the evidence in the light most favorable to the government, the district court, acting as finder of fact, could have found beyond a reasonable doubt that South had joined with Sanchez, as well as Zagheib and Khoury—those "others known and unknown to the grand jury," *see Townsend,* 924 F.2d at 1389–90 (quotations

omitted) (citations omitted)—to import cocaine for resale.

■■■ In his brief, South first argues that all of Zagheib's testimony should be disregarded since there was no evidence that Zagheib and South were coconspirators. Of course, this is nothing more than a rehash of South's earlier objections to Zagheib's testimony, objections which we have already determined to be without merit. Furthermore, to the extent South contests Zagheib's testimony on the basis that South and Zagheib (as well as Khoury) had never met and thus could not be members of the same conspiracy, this, too, is meritless. *United States v. Soto–Rodriguez,* 7 F.3d 96 (7th Cir.1993), makes it clear that the fact that the parties may be unaware of each other's activities does not mean that they are not members of the same conspiracy pursuing a common criminal objective. *See id.* at 100. Zagheib's testimony indicates that he and South, although initially unknown to each other, were both involved in a large-scale distribution network using the same person, Sanchez, to achieve the same objective: the importation and attempted distribution of 156 kilograms of cocaine into Chicago.

■■■ South also contends that his own testimony at trial was sufficient to refute Agent Tucci's testimony concerning South's admissions. This, however, is nothing more than an invitation for us to reassess the credibility of the government's witness. The district court, unlike this court, had ample opportunity to observe and assess the demeanors of both South and Agent Tucci. Based on these observations, the district court expressed its view of South's credibility when it stated that a person as knowledgeable of the ways of life as South would not, just because he is upset, admit to being part of a 156–kilogram cocaine transaction. The district court was entitled to make this determination, *see United States v. DePriest,* 6 F.3d 1201, 1208 (7th Cir.1993), which we will not disturb. Therefore, our review of the evidence convinces us that the government presented sufficient evidence of South's participation in the conspiracy.

## 2. Attempt charge.

■ South next attacks the sufficiency of the evidence supporting his conviction under 21 U.S.C. §§ 841(a)(1) and 846 for attempting to possess cocaine with intent to distribute. In his brief, South merely devoted two short paragraphs on the general law on attempt, without offering any argument as to how this law applied to the facts of his particular case. Moreover, at oral argument, South offered no additional argument in support of this issue. Perhaps this is because the evidence of his participation in a very large shipment of drugs is overwhelming. Nevertheless, we have stated on previous occasions that "'perfunctory and undeveloped arguments ... are waived....'" *United States v. Windom*, 19 F.3d 1190, 1198 (7th Cir.1994) (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993)); *accord Chambers v. American Trans Air, Inc.*, 17 F.3d 998, 1005 (7th Cir.1994). "Ours is an adversary system," *United States v. Seacott*, 15 F.3d 1380, 1390 (7th Cir.1994) (Easterbrook, J., concurring); *United States v. Davenport*, 986 F.2d 1047, 1049 (7th Cir.1993), and it is up to the party seeking relief to sufficiently develop his arguments. South's nonchalant treatment of this issue leads us to conclude that he considers the inquiry of little consequence. *See Berkowitz*, 927 F.2d at 1384. Consequently, South's challenge to the sufficiency of the evidence in support of his conviction for attempt is waived.

## C. Ineffective Assistance of Counsel

Predictably, South's final challenge is to the adequacy of counsel's performance below. South, in his brief, points to three incidents which, in South's opinion, fell so far below minimal standards of performance that the result of the trial was unreliable or fundamentally unfair. *See Durrive v. United States*, 4 F.3d 548, 550 (7th Cir.1993) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 374, 106 S.Ct. 2574, 2582, 91 L.Ed.2d 305 (1986)). South's first claim of error on the part of trial counsel was counsel's failure to obtain a ruling from the district court on whether Zagheib was a coconspirator for purposes of Rule 801(d)(2)(E). This failure led to the admission of Zagheib's testimony which, according to South, led to South being convicted on the basis of hearsay which, in turn, prevented South from obtaining a fair trial. Counsel's second instance of substandard performance was agreeing to the government's request that South's trial counsel, during his examination of Zagheib, would not bring up the fact that Zagheib had HIV. Lastly, South claims that trial counsel's characterization, during closing argument before the district judge, of South's admission as a "confession" caused the district court to find South guilty on the basis of this characterization rather than on evidence establishing South's guilt beyond a reasonable doubt.

■ At oral argument, we questioned South's attorney whether he truly wanted to challenge the effectiveness of trial counsel in this direct appeal. We expressed our concern that in making this challenge at this time, and not at a collateral proceeding under 28 U.S.C. § 2255, South was asking us to review a claim the factual basis for which was not contained in the unadorned trial record. *See Bond v. United States*, 1 F.3d 631, 635 (7th Cir.1993); *see also Guinan v. United States*, 6 F.3d 468, 471 (7th Cir.1993) ("Often, indeed usually, the effectiveness of a trial lawyer's performance cannot be evaluated without an evidentiary hearing at which the lawyer is asked to explain why he did not follow seemingly promising lines of defense."). We further reminded South that in the event he makes his claim on direct appeal and it is rejected, then that decision will be binding on the district court through law of the case, leaving South with the unenviable task of convincing the district judge that he should disregard our previous ruling. *See United States v. Taglia*, 922 F.2d 413, 418 (7th Cir.), *cert. denied*, 500 U.S. 927, 111 S.Ct. 2040, 114 L.Ed.2d 125 (1991); *Page v. United States*, 884 F.2d 300, 302 (7th Cir. 1989); *United States v. Mazak*, 789 F.2d 580, 581 (7th Cir.1986). That is why we said in *Bond* that "'a defendant who presents an ineffective-assistance claim for the first time on direct appeal has little to gain and everything to lose.'" *Bond*, 1 F.3d at 635 (quoting *United States v. Davenport*, 986 F.2d 1047, 1050 (7th Cir.1993)). Nevertheless, South

unequivocally stated that he wanted to raise this challenge on his direct appeal. The government also requested that we resolve the issue at this time. We will abide by the parties' request. *See United States v. Reiswitz*, 941 F.2d 488, 495 (7th Cir.1991); *see also Guinan*, 6 F.3d at 472–73 ("[W]e do not ordinarily forbid an appellant to present an argument for reversal merely because the probability that the argument will be accepted is low. We are not so paternalistic. If the argument is made and rejected, . . . the appellant must live with the consequences."). In so doing, we will limit our review to the trial record before us and grant every indulgence "to the possibility that any seeming lapse or error on the part of trial counsel was in fact a tactical move, flawed only in hindsight." *Taglia*, 922 F.2d at 417–18.

 We need not spend long on any of South's claims for none of them, in isolation or in combination, establish that trial counsel's representation was constitutionally deficient. With respect to counsel's not taking any steps to have the court determine Zagheib's status as a coconspirator before allowing him to testify, we have already demonstrated in Part I.A of this opinion why this would have been a pointless task. Furthermore, we cannot see the relevancy of bringing out the fact that Zagheib was HIV positive. In his brief, as well as at oral argument, South suggested that perhaps questioning on this matter would have revealed that Zagheib acquired HIV through the use of hypodermic needles, which would possibly prove that he was a drug user which, in turn, would further undermine his credibility. This, of course, is sheer speculation on South's part, and we think that South's trial counsel, in deciding not to pursue this matter, made a legitimate trial decision not to waste his or the court's time. Lastly, counsel's characterization of South's admission as a confession was nothing more than a slip of the tongue. *Cf. United States v. Van Fossan*, 899 F.2d 636, 638 (7th Cir.1990) (refusing to reverse and remand for a new trial where the magistrate inadvertently misstated the government's burden of proof). There is no merit to any of South's contentions that trial counsel's performance fell below professional standards, much less that it deprived South of a fair trial.

### III.

South has presented no plausible basis for overturning the district court's verdicts. He cannot invoke Rule 801(d)(2)(E) as a means to object to Zagheib's testimony. Furthermore, sufficient evidence supports both of South's convictions. Finally, South cannot establish such ineffectiveness of trial counsel under the Sixth Amendment that would warrant a reversal of his convictions. Therefore, the judgment of the district court is

AFFIRMED.